**Robert SUTHERS and Niwana Martin, Plaintiffs,**

**v.**

**AMGEN INC., Defendant.**

**No. 05 Civ. 4158(PKC).**

United States District Court, S.D. New York.

April 19, 2006.

Alan C. Milstein, Alan Carl Milstein, Michael Dube, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, NJ, for plaintiffs.

Dennis H. Tracey, III, Lauren Schultz Colton, Hogan & Hartson L.L.P.(NYC), New York, NY, Mark D. Gately, Hogan & Hartson L.L.P.(MD), Baltimore, MD, for defendant.

*MEMORANDUM AND ORDER*

CASTEL, District Judge.

Plaintiffs have brought suit against Amgen Inc. ("Amgen"), a pharmaceutical company owning the rights to an experimental treatment for Parkinson's disease. The plaintiffs, Robert Suthers and Niwana Martin, participated in a clinical trial of

the treatment conducted by a board certified neurologist who is on the faculty of the New York University School of Medicine ("NYUSOM"). Plaintiffs consider the treatment to be beneficial to them. Amgen elected to terminate the clinical trial and, in their complaint, plaintiffs seek a permanent injunction requiring Amgen to supply NYUSOM with the means to continue the experimental treatment, as well as money damages. After a hearing, I denied plaintiffs' motion for a preliminary injunction in a written opinion, 372 F.Supp.2d 416 (S.D.N.Y.2005), and familiarity therewith is assumed.

Defendant Amgen now moves to dismiss all six claims alleged in the complaint; breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, breach of fiduciary duty, negligence and violation of N.Y. General Business Law § 349. In addition to its 105 numbered paragraphs, the complaint annexes and incorporates 9 "certifications" of witnesses and a 22–page informed consent form.

I approach this motion keeping in mind that Rule 8, Fed.R.Civ.P., requires no more than notice pleading. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Post-*Swierkiewicz*, the Supreme Court has upheld the grant of a motion to dismiss under Rule 12(b)(6) where the allegations of the complaint were inconsistent with the existence of a viable claim on the part of the plaintiff. *See Domino's Pizza, Inc. v. McDonald,* — U.S. ——, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006); *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005); *Tenet v. Doe,* 544 U.S. 1, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005). *See also Pugel v. Bd. of Trustees of Univ. of Ill.,* 378 F.3d 659, 665 (7th Cir.2004) ("This court is not obligated by the standard of review to disregard factual allegations that undermine a plaintiff's claim."). In reviewing the allegations of the complaint, I have accepted all factual allegations as true and have drawn all reasonable inferences in plaintiffs' favor. I nevertheless conclude that plaintiffs' allegations negate the existence of a viable cause of action in any of the six asserted claims and, accordingly, grant Amgen's motion to dismiss.

*The Allegations of the Complaint*

Plaintiffs Suthers and Martin both suffer from Parkinson's Disease, a progressive neurodegenerative disorder. An individual with Parkinson's experiences a loss of dopaminergic neurons in his or her brain, which causes tremors, shaking, slow movement and muscle stiffness and rigidity. (Compl.¶ 8) Existing treatments for the disease replace dopamine in the brain. (*Id.* ¶ 9) While this temporarily masks the symptoms of Parkinson's, it does not prevent the death of those brain cells that produce dopamine. (*Id.* ¶¶ 9, 10)

In the early 1990s, a Colorado biotechnology company, Synergen, designed a protein called glial cell line-derived neutropic factor ("GDNF") as an alternative treatment for Parkinson's. (*Id.* ¶ 11) Preliminary results indicated that GDNF could cause the growth of dopamine-producing brain cells and thus provide a more effective treatment for Parkinson's. (*Id.* ¶ 13) In 1994, defendant Amgen acquired Synergen for $240 million. (*Id.* ¶ 14)

Dr. Steven S. Gill of Frenchay Hospital in Bristol, England, designed a means of delivering GDNF to the brains of Parkinson's sufferers. (*Id.* ¶ 16) In his design, pumps are surgically implanted in a patient's abdomen and catheters are threaded through the patient's chest, neck and head, thus delivering GDNF directly to the brain. (*Id.* ¶ 17) Dr. Gill conducted two Phase I studies of the system on a total of fifteen patients, none of whom experienced any adverse events. (*Id.* ¶¶ 18–19; Hutch-

inson Cert., attached as Compl. Ex. A, ¶¶ 13–14)

In 2003, Amgen sponsored a double-blind Phase II trial of Dr. Gill's procedure for delivering GDNF. (Compl.¶¶ 20, 33–34) The trial involved 34 patients at multiple sites, including NYUSOM. (*Id.* ¶ 20) The Institutional Review Board ("IRB") of NYUSOM approved the trial protocol, which provided that the trial would begin by implanting pumps in subjects' abdomens and drilling holes in their skulls. (*Id.* ¶¶ 23–24) Once this stage had been completed, one half of the subjects would receive GDNF for six months and the other half would receive a placebo. (*Id.* ¶ 24)

Both plaintiffs signed documents indicating their informed consent to their participation. (*Id.* ¶¶ 27–28) In the first six months of the study, each of the two plaintiffs received a placebo. (*Id.* ¶ 33) Neither plaintiff knew that he or she was part of the placebo group, and neither plaintiff experienced any benefit during the six-month period of the study. (*Id.* ¶ 34) The informed consent form signed by plaintiffs (Compl. Ex. J at 2) stated that, at the end of the six months, a study participant "may be invited to participate in a separate extended treatment study, which guarantees, if you are eligible to be enrolled, that you will receive liatermin and not a placebo." (*Id.* at 3)[1] In addition, the form stated that the "Principal Investigator may … decide to withdraw you from the study under certain circumstances. Some possible reasons for withdrawing a subject from the study would be deteriorating health or other conditions that might make continued participation harmful to you. These include events such as … termination or cancellation of the study by the sponsor." (*Id.* at 20)

At the end of the six-month study, both plaintiffs began to receive GDNF as participants in the extended treatment study. (Compl.¶ 36) Suthers began receiving GDNF on March 30, 2004, and Martin began receiving the treatment on April 4, 2004. (*Id.* ¶¶ 39, 41) Plaintiffs allege that they "then experienced marked improvement" in their condition. (*Id.* ¶ 37) Plaintiffs have attached as exhibits to their complaint certifications by physicians who treated them during this period, asserting that GDNF was "safe and of benefit to the plaintiffs." (*Id.* ¶ 42; Hutchinson Cert. ¶ 30; Penn Cert., attached as Compl. Ex. D, ¶ 26; Gash, et al. Aff't, attached as Compl. Ex. E, ¶ 3)

In August 2004, defendant received the results of primates studies in which four of seventy GDNF-supplied subjects exhibited cerebral toxicity. (Compl.¶ 47) Shortly thereafter, defendant announced that it was terminating the clinical trial. (*Id.* ¶ 49) The principal investigator at the NYUSOM site, Michael Hutchinson, M.D., Ph.D., disputed the findings of the primate studies, contending that the test subjects had received dosages at least ten times higher than what would have been given to a human and that the cause of the cerebral toxicity was the abrupt withdrawal of GDNF. (Hutchinson Cert. ¶ 32) Dr. Hutchinson and other physicians involved in the clinical trial have maintained that GDNF is safe and effective. (Compl. ¶ 54; Hutchinson Cert. ¶¶ 44–45; Penn Cert. ¶¶ 38–39)

Representatives of Amgen argued that any reported benefits to human subjects were a result of a placebo effect and that GDNF is not an effective treatment. (Compl.¶ 53) The complaint alleges that the conditions of Suthers, Martin and other Parkinson's sufferers involved in the

---

**1.** In this memorandum and order, GDNF is used interchangeably with the term "liater-min", which appears in the text of the informed consent document.

trial worsened in the months following the end of the trial and reverted to their state prior to the administration of GDNF. (*Id.* ¶¶ 59–66; Exhibit C ¶ 21) Plaintiffs seek to continue receiving GDNF, and they allege that defendant's decision to terminate the clinical trial was "unreasonable and contrary to its fiduciary, contractual, and ethical obligations to the plaintiffs." (*Id.* ¶¶ 67–69)

*The Standard on this Motion*

In deciding a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of plaintiff. "Dismissal is not appropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "At the 12(b)(6) motion stage, 'the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'" *Id.* at 701 (citations omitted).

Plaintiff's complaint is to be judged by a notice pleading standard. *See Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992. The complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,'" and does not require a claimant to set out factual details on which the claim rests. *Id.* (quoting *Conley*, 355 U.S. at 47, 78 S.Ct. 99). *See also Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir.2005) (noting that a complaint need only satisfy the "bare-bones notice-pleading requirements of Rule 8(a)" to survive a motion to dismiss).

Although the Court is limited to facts as stated in the complaint, it may consider exhibits to the complaint, or documents incorporated by reference into the complaint, without converting the motion into one for summary judgment. *See Int'l Audiotext Network, Inc. v. AT & T Co.*, 62 F.3d 69, 72 (2d Cir.1995) (citing *Cortec Indust., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991)). "[A] plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir.1995) (Posner, J.). "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Rule 10(c), Fed. R.Civ.P. This Court is "not obliged to accept the allegations of the complaint as to how to construe such documents, but at this procedural stage, [the Court] should resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir.2005).

*Discussion*

I. *Breach of Contract*

■ I will first address the plaintiffs' breach of contract claim, Count Three. It alleges that an "informed consent document," attached to the complaint as Exhibit J (the "Informed Consent"), is a valid, binding contract between Amgen and the plaintiffs. (Compl.¶ 89) Plaintiffs allege that the document was "created by Amgen" but do not allege that Amgen was a signatory. (*Id.*) To assert a claim of breach of contract under New York law, the "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir.2004)

(quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir.1996)).

■ The 22–page document that plaintiffs allege to be the contract with Amgen is titled "Informed Consent Form to Participate in Screening for Research". (Compl. Ex. J at 1) It carries on each page the heading of "Office of Institutional Board of Research Associates NYU School of Medicine". (*Id.* at 1–22) It recites that "[t]his Consent Document is approved for use by the New York University's Institutional Review Board (IRB)." (*Id.* at 1) It bears the stamp "NYUSOM IRB Approved". (*Id.*) Dr. Hutchinson, who is on the faculty of NYUSOM, is identified as the "Principal Investigator". (*Id.*) The Informed Consent is structured for signature by the study participant and by the "person obtaining the consent", as well as a witness. (*Id.* at 22) Dr. Hutchinson "engaged in the informed consent process" with the plaintiffs (Hutchinson Cert. ¶ 20; Suthers Cert., attached as Compl. Ex. B., ¶¶ 9–10; Martin Cert., attached as Compl. Ex. C, ¶¶ 9–10).

In the text of the Informed Consent, the drug is identified as having been "made by Amgen Inc." and Amgen and Medtronic Inc., the manufacturer of the pump and catheter, are identified as "jointly sponsoring this research study". (*Id.* at 2) It describes the nature of the research, the screening and evaluation procedures and the risks of participation. (*Id.* at 2–5) It also recites that " ... Amgen Inc. shall provide reimbursement for reasonable and necessary medical expenses incurred by you for the treatment of such adverse reactions to the extent this is not covered by your medical insurance or third-party payers." (Exhibit J at 18) Drawing all reasonable inferences in plaintiffs' favor, I conclude that plaintiff could prove a set of facts consistent with their complaint that the Informed Consent imposed certain contractual obligations on, among others, Amgen.

That the Informed Consent contains language consistent with the existence of *some* contractual obligation on the part of Amgen does not answer the question of whether the contractual promise that plaintiffs seek to impose can be fairly read into the Informed Consent. While an understanding may be implied in fact, *Miller v. Schloss*, 218 N.Y. 400, 406–07, 113 N.E. 337 (1916), it must be bilateral and the product of a meeting of the minds. *See I.G. Second Generation Partners L.P. v. Duane Reade*, 17 A.D.3d 206, 208, 793 N.Y.S.2d 379 (1st Dep't 2005) (citing *Miller v. Schloss*, 218 N.Y. 400, 406, 113 N.E. 337 (1916)).

The complaint unambiguously relies upon the Informed Consent as the font of the contractual promises alleged to have been breached. (Compl.89–91) The Informed Consent provides, in relevant part, as follows:

> It is expected that your participation in this study will take a minimum of 10 months (a 3–month eligibility evaluation period, 6 months of receiving liatermin or placebo, and a 1–month follow-up).... Participants who complete 6 months of treatment may be invited to participate in a separate extended treatment study, which guarantees, if you are eligible to be enrolled, that you will receive liatermin and not a placebo.

(Compl. Ex. J at 3) Thus, a subject who completes the 6–month, double-blind study "may be invited" for a subsequent study in which the subject would be "guarantee[d]" to receive GDNF rather than a placebo. The Informed Consent does not specify how much, how often or for how long any particular patient in the extended treatment study would receive the treatment. Plaintiffs completed the first study and were, indeed, invited to participate in the

follow-on study. (Compl.¶ 36) Plaintiffs allege that they were promised that they would "receive GDNF indefinitely", language that does not appear in the Informed Consent. (*Id.* ¶ 25)

The claim of perpetual or indefinite duration to the obligation to supply GDNF is contradicted by other provisions of the Informed Consent giving the principal investigator the right to "withdraw" a patient. Specifically, the Informed Consent provides as follows:

> The Principal Investigator [Dr. Hutchinson] may also decide to withdraw you from the study under certain circumstances. *Some possible reasons* for withdrawing a subject from the study would be deteriorating health or other conditions that might make continued participation harmful to you. These include events such as: 1) serious adverse reaction to drug therapy; 2) the need for treatment that is not allowed in the study; or 3) *termination or cancellation of the study by the sponsor.*

(Compl. Ex. J at 20) (emphasis added).

The quoted language placed the plaintiffs on notice that they could be withdrawn from the study. It provided a non-exhaustive listing of "[s]ome possible reasons" for withdrawal. It expressly set forth one of the reasons as "termination or cancellation of the study by the sponsor." (*Id.*) Plaintiffs read this language to mean that the principal investigator had veto power over the decision of the sponsor, *i.e.*, Amgen, to terminate or cancel the study. (Pl. Mem. at 15) Fairly read, the words do not permit that conclusion. Nor can they be fairly read to mean that there were conditions precedent to the sponsor's right to cancel the study, such as a finding that the drug was not safe or efficacious. True, the language of the contract does not state that the principal investigator must withdraw the plaintiffs if the study is cancelled by the sponsor.[2] However, there is no language in the Informed Consent that supports the proposition that the failure of the principal investigator to withdraw the plaintiffs following the cancellation of the study by the sponsor gives rise to a viable claim against the sponsor for canceling the study. The Informed Consent contemplates that the study could be terminated by the sponsor and places no limitation on its right to do so.

The complaint makes reference to a "protocol" for the study. (Compl.¶ 23–25) The protocol was "submitted to, and approved by" the IRB of NYUSOM (*Id.* ¶ 23), but nowhere in the text of the complaint or its 10 exhibits is there an allegation that the plaintiffs knew of the contents of the protocol prior to agreeing to participate in the study or, indeed, at any time prior to the cancellation of the study. Count Three refers only to the Informed Consent as the basis of the alleged contractual obligation of Amgen to plaintiffs and the text of the Informed Consent negates the existence of a contractual promise to supply "GDNF indefinitely" as alleged in the body of the complaint.[3] Count Three does not state a claim upon which relief may be granted.

---

**2.** It is relevant to note that a non-withdrawn participant in a cancelled study is a status with some meaning under the Informed Consent. At a minimum, the participant would appear to be entitled to the "close [] monitor[ing]" and "full medical care" that may be associated with the continued presence of the implanted pump and catheter. (Compl. Ex. J at 12)

**3.** *Cf. Darke v. Isner*, 2005 WL 3729113, *8 (Mass.Super.Nov.22, 2005) (rejecting plaintiff's breach of contract claim based upon an informed consent form, in part, because the form contained no express promise of a cure or improvement in patient's condition).

## II. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

In Count Four, plaintiffs purport to allege a claim for breach of the implied covenant of good faith and fair dealing. (Compl.¶¶ 93–98) The allegations make plain that the Informed Consent provides the sole support for this claim. (*Id.* ¶ 94)

■ "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *1–10 Industry Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 631, 747 N.Y.S.2d 29 (2d Dep't 2002). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002) (citations and internal quotation marks omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (citation omitted).

■ "New York recognizes an implied and enforceable obligation of good faith and fair dealing on the part of a party to a contract in appropriate circumstances; however, '[i]n such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship.'" *Horn v. N.Y. Times*, 100 N.Y.2d 85, 92, 760 N.Y.S.2d 378, 790 N.E.2d 753 (2003) (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)). Thus, "[t]he implied covenant ... does not 'add[ ] to the contract a substantive provision not included by the parties.'" *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–199 (2d Cir.2005) (quoting *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987)).

■ Plaintiffs have no support for the broad proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract. Indeed, courts have refused attempts to impose liability on a party that engaged in conduct permitted by a contract, even when such conduct is allegedly unreasonable. For example, the Second Circuit recently addressed a debtor's counterclaim against a creditor who refused to grant consent under a loan agreement to the sale of certain assets in possession of the debtor. *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 168–71 (2d Cir.2004), *cert. denied*, 543 U.S. 1177, 125 S.Ct. 1309, 161 L.Ed.2d 161 (2005) (affirming denial of motion to vacate default judgment). "Where a contract allows a bank to withhold consent for particular conduct and sets no express restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent." *Id.* at 170 (citing *Bonady Apartments v. Columbia Banking Fed. Sav. & Loan Ass'n*, 119 Misc.2d 923, 465 N.Y.S.2d 150, 154 (N.Y.Sup.Ct.1983), *aff'd*, 99 A.D.2d 645, 472 N.Y.S.2d 221 (4th Dep't 1984)).

Defendant's motion is granted as to plaintiff's good faith and fair dealing claim.

## III. *Promissory Estoppel*

Count One of the complaint purports to allege a promissory estoppel claim. The plaintiffs allege that the principal investigators who are the doctors "who performed the[ ] procedures on the plaintiffs and who treated them and knew them best" were agents of Amgen. (Compl.¶ 42) It further alleges that the "... Principal

Investigators ... promised plaintiffs that if the plaintiffs agreed to participate in a clinical trial to test the efficacy of GDNF, and if GDNF was shown to be safe and effective, the plaintiffs would have continued access to the drug for as long as it was helping them." (*Id.* ¶ 76) The plaintiffs assert that they relied on these representations "after meeting with Dr. Hutchinson and seeing how professional, knowledgeable, and compassionate he was." (*Id.* ¶ 78) The Informed Consent identifies Dr. Hutchinson of NYUSOM as the sole "principal investigator". (Compl. Ex. J at 1) The statements of the two plaintiffs, made under penalty of perjury and annexed to the complaint, identify only Dr. Hutchinson as a person with whom they met prior to agreeing to participate in the trials.

New York recognizes that a party making a promise, not supported by consideration, may be estopped from denying the enforceability of the promise where another has relied upon the promise to his detriment. "To establish a viable cause of action sounding in promissory estoppel, a plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise." *Rogers v. Town of Islip*, 230 A.D.2d 727, 727, 646 N.Y.S.2d 158 (2d Dep't 1996); *accord New York City Health & Hosps. Corp. v. St. Barnabas Hosp.*, 10 A.D.3d 489, 491, 782 N.Y.S.2d 12 (1st Dep't 2004).

As to the "clear and unambiguous promise", the statements of Dr. Hutchinson and the two plaintiffs which are annexed to the complaint are silent as to the contents of the promise except as to their reference to the Informed Consent which I have already held contains no actionable promise by Amgen to supply GDNF indefinitely. The text of Count One of the complaint alleges a promise that "if GDNF was shown to be safe and effective, the plain-

tiffs would have continued access to the drug for as long as it was helping them." (Compl. ¶ 76) This formulation of a promise leaves open such basic questions as to whom GDNF would have to be "shown" to be safe and effective, whether the promise would be enforceable if the Food and Drug Administration ("FDA") ordered a termination of the trial over an objection by Amgen that the product was safe and effective, whether Amgen would be required to provide access to the drug if the principal investigator withdrew from the study, who would determine whether the drug was helping plaintiffs, whether the promise would be enforceable if the help were negligible or only subjectively perceived and whether the promise would be enforceable if the treatment helped plaintiffs but was harmful to other participants. I conclude that the alleged promise is neither "clear" nor "unambiguous".

In view of my determination that no "clear and unambiguous" promise is alleged, I do not need to reach the question of whether the complaint, read in a light most favorable to plaintiff, contains sufficient factual allegations of agency. The promissory estoppel claim is dismissed.

## IV. Breach of Fiduciary Duty

In Count Two of the complaint, plaintiffs allege that "Amgen owed a fiduciary duty to them". I read this legal conclusion in light of all factual allegations in the complaint and, as previously noted, I view those allegations in a light most favorable to the pleading party. The parties acknowledge that there is no New York authority that speaks to the question of whether the sponsor of a research trial stands as a fiduciary to the participants.

If presented to the Second Circuit, the court would "either (1) predict how the New York Court of Appeals would resolve the state law question, or, if state law is so

uncertain that [the court] can make no reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive resolution." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 428, 163 L.Ed.2d 326 (2005) (refusing to certify). In predicting how the New York Court of Appeals would resolve the issue, the Second Circuit first considers the "language of the state intermediate appellate courts [as] helpful indicators of how the state's highest court would rule." *Id.* at 112. If these sources did not resolve the question, the Court would then "look to the language of other jurisdictions on the same issue...." *Id.* (citing *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir.2000)).

 In New York, a fiduciary relationship arises "where one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relations." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir.1991) (citing *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672 (1st Dep't 1987)). A fiduciary duty may be one "imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contract agreement." *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 55, 529 N.Y.S.2d 279 (1st Dep't 1988). *See also Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900 (2d Dep't 1976), *appeal dismissed*, 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977) ("Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another.").

 Fiduciary duties do not arise solely because one party has expertise that is superior to another. *See Ross v. FSG PrivatAir, Inc.*, 2004 WL 1837366, at *6 (S.D.N.Y. Aug.17, 2004). New York courts have not hesitated to find fiduciary duty claims deficient when a plaintiff has not pled or proved facts demonstrating a fiduciary duty or "any relationship approaching privity." *Columbia Mem'l Hosp. v. Barley*, 16 A.D.3d 748, 749, 790 N.Y.S.2d 576 (3d Dep't 2005). *See also Doe v. Holy See (State of Vatican City)*, 17 A.D.3d 793, 795–96, 793 N.Y.S.2d 565 (3d Dep't 2005), *lv. to appeal denied*, 6 N.Y.3d 707 (2006) (no fiduciary relationship between local church member and the Vatican).

Plaintiffs urge this Court to adopt the reasoning of the Maryland Court of Appeals in *Grimes v. Kennedy Krieger Inst., Inc.*, 366 Md. 29, 782 A.2d 807 (2001), a case that found the existence of a duty sounding in tort running from medical researchers to children whose parents allegedly had been induced to live in homes with lead paint in order to test the effects of exposure. In my Memorandum and Order denying the motion for a preliminary injunction, I distinguished *Grimes* and other cases and will not repeat the discussion here. *Suthers*, 372 F.Supp.2d at 427.[4]

A legal conclusion that a sponsor is a fiduciary who owes a duty of undivided loyalty to a participant in a drug trial would have profound implications for research and new product development. Clinical trials are conducted to determine whether a government regulatory body, the FDA, should allow the drug to enter the marketplace. Any study conducted

---

**4.** Recently, the Court of Appeals for the Sixth Circuit had occasion to affirm the denial of a preliminary injunction sought by other GDNF study participants who sought to compel Amgen to continue to provide the treatment. *Abney v. Amgen*, 443 F.3d 540 (6th Cir.2006). In rejecting an invitation to find that Ken-

tucky would recognize a fiduciary duty, the Sixth Circuit quoted two paragraphs of text from this Court's discussion of *Grimes* and concluded that the "analysis applies with equal force" to the case before it. *Id.* at 550–51.

under the direct administration of the pharmaceutical company would be inherently suspect because of its financial interest in bringing a new drug to market. The independence of the investigator from the sponsoring enterprise is necessary to ensure objectivity and is implicit in the "common rule", 45 C.F.R. § 46.101 et seq. These federal regulations require that it is the investigator who recruits the subjects, determines their suitability, monitors their tolerance and reaction and reports the results. Under the "common rule", the investigator is answerable to his or her "institutional review board". 45 C.F.R. § 46.109. This framework envisions the sponsoring organization maintaining its distance and detachment from the participants in the study, a status incompatible with acting as their fiduciary.

Furthermore, the importation of an ill-defined fiduciary duty into the field of clinical drug trials would raise other concerns. For example, in a double-blind placebo study, such as was conducted in this case, the supposed fiduciary would be charged with knowledge that some of the persons to whom it owed this duty were not receiving a potentially beneficial drug. The fiduciary would be required to reassess the best interests of a study participant based upon preliminary and incomplete results. Necessarily, it would be guided by the interests of each individual participant and not by the search for truth about the safety and efficacy of the drug. This would likely undermine the reliability of research results which, in turn, could undermine drug safety.

There are powerful reasons for a person to elect not to participate in a drug trial and, instead, pursue an available course of treatment or await the outcome of a research study in which others have participated. The goal of the drug trial is to add to the body of information concerning the tested drug.[5] Those who selflessly brave the risks stand to benefit a broader population by helping to prove or disprove the safety and efficacy of a drug. Any benefit to the participant is incidental. Under the framework of the "common rule", the requirement of informed consent is the principal protection provided to the participant. I conclude that there is no basis to impose a fiduciary duty on the sponsor and dismiss the claim.

## V. *Negligence*

■ Count Six alleges that "Amgen had a duty to exercise reasonable care toward plaintiffs" and breached this duty by its actions. (Compl.¶¶ 102–03) "To establish a prima facie case of negligence, plaintiff must prove that the defendant owed a duty to her, that defendant breached that duty, and that the breach proximately caused her injury." *J.E. v. Beth Isr. Hosp.*, 295 A.D.2d 281, 283, 744 N.Y.S.2d 166 (1st Dep't 2002), *lv. to appeal denied*, 99 N.Y.2d 507, 757 N.Y.S.2d 817, 787 N.E.2d 1163 (2003) (citing *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985)). "The threshold question in any negligence action is whether the alleged tortfeasor owes a duty of care to the injured party, and the existence and scope of that duty is a legal question for the courts to determine. Indeed, in the absence of duty, there is no breach and without a breach there is no liability." *Sheila C. v. Povich*, 11 A.D.3d 120, 125, 781 N.Y.S.2d 342 (1st Dep't 2004).

There is no claim that the product was negligently designed or manufactured or

---

**5.** The first sentence of the 22–page Informed Consent reads as follows: "The purpose of this research is to determine the potential benefits of liatermin in Parkinson's disease and to find out if patients can tolerate any potential side effects of liatermin." (Compl. Ex. J at 1)

that the defendant failed to exercise reasonable care in warning plaintiffs. Rather, plaintiffs view the drug as beneficial and desire to continue to receive the benefits.

In the absence of New York authority and consistent with *Di Bella*, I must predict how the New York Court of Appeals would rule on the existence and formulation of a sponsor's duty to a research trial participant. Judge Bellacosa, writing for a unanimous court in *Palka v. Servicemaster*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189 (1994), provided an overview of the considerations that enter into a New York court's formulation of an alleged tortfeasor's duty:

> Unlike foreseeability and causation, which are issues generally and more suitably entrusted to fact finder adjudication, the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration.... Common-law experience teaches that duty is not something derived or discerned from an algebraic formula. Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility. These sources contribute to pinpointing and apportioning of societal risks and to an allocation of burden of loss and reparation on a fair, prudent basis....

*Id.* at 585, 611 N.Y.S.2d 817, 634 N.E.2d 189 (citations omitted). *See also 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 288–89, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001).

There is no serious dispute that "[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully if he acts at all." *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896 (1928) (Cardozo, J.). But the question remains whether New York would impose a tort-based duty to continue a drug research trial upon a party who voluntarily undertakes to initiate the research trial.

Comment (c) to Restatement (Second) Torts § 323 speaks to the question of whether a gratuitous actor, once having begun to render assistance, may cease to act. It comes down squarely in favor of the right to cease acting for any reason or no reason. In relevant part, the comment reads as follows:

> The fact that the actor gratuitously starts in to aid another does not necessarily require him to continue his services. He is not required to continue them indefinitely, or even until he has done everything in his power to aid and protect the other. The actor may normally abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him. His motives in discontinuing the services are immaterial. It is not necessary for him to justify his failure to continue the services by proving a privilege to do so, based upon his private concerns which would suffer from the continuance of the service. He may without liability discontinue the services through mere caprice, or because of personal dislike or enmity toward the other.[6]

---

**6.** The comment has been cited with approval by the New York Court of Appeals, though it would be an unwarranted stretch to say that it has been adopted wholesale as a definitive pronouncement of New York law. *See Heard v. City of New York*, 82 N.Y.2d 66, 73, 603 N.Y.S.2d 414, 623 N.E.2d 541 (1993). *See also Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d

As the above paragraph notes and other parts of the comment make explicit, the actor, however, may incur liability if his actions in ceasing to render aid places the person in a worse position then before he began to act. Fairly read in context, the complaint alleges that GDNF ameliorates the symptoms of Parkinson's disease and when the drug is withdrawn the symptoms return. *See, e.g.,* Martin Cert. ¶ 21: "Since GDNF was withdrawn from my system, things have gone 'back to normal' with all of the drug's benefits having disappeared."; Hutchinson Cert. ¶ 42: "[A]ll of the improvements that Ms. Martin showed during the period of time she was on GDNF are gone." There is no allegation that these plaintiffs were worse off than their pre-GDNF baseline because of the administration and withdrawal of GDNF.

There is the question of whether the surgical implantation of the pump and catheter system, with associated complications, amounts to the type of worsening that would give rise to liability in negligence against Amgen, as a sponsor of the study. But, in this case, the Medtronic pump and catheter system was implanted after the Informed Consent was given. The Informed Consent left open the possibility that plaintiffs, having undergone the implantation surgery, would never receive GDNF and would only receive placebos. (Compl. Ex. J. at 3) Any harm caused by the surgical implantation arises from participation in the research trial and not from the administration and withdrawal of GDNF.

Of course, even if plaintiffs could fashion a negligence claim from an alleged worsening below a pre-GDNF baseline, their remedy would not likely be the type of expectation remedy—*i.e.,* a bargained-for exchange—that a contract claim, had it been viable, might have afforded. The measure of plaintiffs' damages for negligence in

507, 523, 429 N.Y.S.2d 606, 407 N.E.2d 451

withdrawing aid would be the difference between what their condition would have been if GDNF had never been administered as compared to what it is having received GDNF but having had it withdrawn. No such claim can be fairly read in this complaint.

Based on my review of New York law and the approach adopted in Comment (c) to Restatement (Second) § 323, I conclude that plaintiff has not pled a viable claim sounding in negligence.

## VI. *Deceptive Acts Under New York General Business Law § 349*

Plaintiffs also allege that defendant engaged in a misleading practice in violation of New York General Business Law § 349. (Compl.¶¶ 99–101) In moving to dismiss this claim, defendant argues that its conduct was neither directed at consumers nor materially deceptive, and therefore plaintiff's deceptive acts claim fails. (Def. Mem. at 23–25)

Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service...." "In order to make out a valid section 349 claim, a plaintiff must allege both a deceptive act or practice directed toward consumers and that such act or practice resulted in actual injury to a plaintiff." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.,* 3 N.Y.3d 200, 205–206, 785 N.Y.S.2d 399, 818 N.E.2d 1140 (2004) ("[T]he scope of the statute is intentionally broad, applying to virtually all economic activity."). "Additionally, the allegedly deceptive acts, representations or omissions must be misleading to 'a reasonable consumer.'" *Goshen v. Mut. Life Ins. Co.,* 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002)

(1980).

(quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N. A.*, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)).

Taking plaintiffs' factual allegations as true, the conduct of defendant was not directed to consumers. The New York Court of Appeals has held that this threshold requirement demands that plaintiffs "must demonstrate that the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund,* 85 N.Y.2d at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741. *Compare id.* (concluding that the requirement was met because claim involved an extensive marketing scheme) *with N.Y. Univ. v. Cont. Ins. Co.,* 87 N.Y.2d 308, 321, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) (concluding that requirement was not met because claim involved only a private contract dispute as to policy coverage). Plaintiffs do not allege that defendant interacted directly with them; indeed, any communication by the principal investigators was with a small universe of persons meeting the research criteria. Plaintiffs acknowledge that they signed an Informed Consent after having met with Dr. Hutchinson and make no claim that they were deceived. (Martin Cert. ¶¶ 9–10; Suthers Cert. ¶¶ 9–10) Moreover, there were no "consumers" of GDNF. Defendant was sponsoring clinical trials, a necessary predicate to any lawful sales.

Plaintiffs have failed to plead facts that defendant's actions were directed to consumers, and therefore the section 349 claim fails. Defendant's motion to dismiss this claim is granted.

*Conclusion*

Defendant's motion is GRANTED as to all claims asserted in this action. The Clerk is directed to enter judgment in defendant's favor.

SO ORDERED.