**WIRELESS INK CORPORATION,**
**Plaintiff,**

v.

**FACEBOOK, INC. and Google,**
**Inc., Defendants.**

**No. 10 Civ. 1841(PKC).**

United States District Court,
S.D. New York.

May 26, 2011.

Jeremy S. Pitcock, The Pitcock Law Group, New York, NY, David R. Stevens, Stevens Law Group, P.C., San Jose, CA, Jennifer Ishimoto, Banie & Ishimoto LLP, Palo Alto, CA, for Plaintiff.

Arastu Kabeer Chaudhury, Jonathan Paul Bach, Cooley Godward Kronish LLP, Kevin X. McGann, Aaron Chase, White & Case LLP, New York, NY, Elizabeth L. Stameshkin, Cooley Godward Kronish L.L.P., San Diego, CA, Eric Tierney, Cooley Godward Kronish LLP, Michael Graham Rhodes, Cooley, LLP, San Francisco, CA, Heidi Keefe, Mark Randolph Weinstein, Cooley Godward Kronish, LLP, Palo Alto, CA, for Defendants.

## MEMORANDUM AND ORDER

### P. KEVIN CASTEL, District Judge:

Plaintiff Wireless Ink Corp. ("Wireless Ink") has asserted multiple claims against defendants Facebook, Inc. ("Facebook") and Google, Inc. ("Google") for direct and indirect patent infringement under 35 U.S.C. § 271, both literal and under the doctrine of equivalents. Defendants assert counterclaims seeking a declaratory judgment (1) that the defendants have not infringed the patent-at-issue, U.S. Pat. No. 7,599,983 (the "'983 patent") and (2) that the '983 patent is invalid and unenforceable. Defendants also assert multiple affirmative defenses, including a defense that the '983 patent is invalid.

Plaintiff and defendants now cross-move for judgment on the pleadings. (Docket # 62, 67.) Defendants move for judgment on the pleadings on the grounds that plaintiff has failed to state a claim for relief and has affirmatively alleged facts in the SAC demonstrating that the accused products do not infringe the '983 patent. Plaintiff cross-moves, arguing that defendants' invalidity counterclaims should be dismissed because the allegations do not plausibly allege that the '983 patent is invalid. Plaintiff also cross-moves to "dismiss" defendants' invalidity affirmative defense, which this Court construes as a motion to strike, pursuant to Rule 12(f), Fed. R.Civ.P.[1] For the reasons set forth below, the defendants' motion is denied. Plaintiff's motion to strike is denied. Plaintiff's motion to dismiss defendants' counterclaims relating to invalidity is granted.

## BACKGROUND

### A. Procedural History

Plaintiff filed the Complaint on March 9, 2010. (Docket # 1.) In response to perceived pleading deficiencies outlined by defendants in an April 26, 2010 letter to the Court, plaintiff elected to file an Amended Complaint on May 14, 2010. (Docket # 16, 17.) In July 2010, defendants filed Answers to the Amended Complaint asserting counterclaims against plaintiff. (Docket # 22, 24.) In November 2010, defendants moved for judgment on the pleadings. (Docket # 51.) In response to plaintiff's "cross-motion" to file an amended complaint, plaintiff was permitted to file a

---

**1.** Rule 12(f) permits a party to challenge the sufficiency of an affirmative defense, while Rule 12(c) permits a party to challenge the sufficiency of a claim or counterclaim. *See* Rule 12(f), Fed.R.Civ.P. (stating that "[t]he court may strike from a pleading an insufficient defense.")

Second Amended Complaint (the "SAC"), and did so on December 3, 2010. (Docket # 53, 54.) Defendants filed Answers to the SAC asserting counterclaims and affirmative defenses. (Docket # 57, 58.) Plaintiff filed Answers to the counterclaims on January 7, 2011. (Docket # 60, 61.) Defendants then renewed their motion for judgment on the pleadings. (Docket # 62.) Plaintiff cross-moved for judgment on the pleadings. (Docket # 67.) Defendants have filed joint briefs with respect to both pending motions.

### B. The '983 Patent

The '983 patent is entitled "Method, Apparatus and System for Management of Information Content for Enhanced Accessibility over Wireless Communication Networks" and was issued on October 6, 2009. (SAC ¶¶ 1, 10.) Since that date, Wireless Ink has been the exclusive owner of all rights in the '983 patent. (SAC ¶ 1.) David Harper, one of the founders of Wireless Ink, is the lead inventor of the '983 patent. (SAC ¶ 57.)

In basic terms, the patent discloses a method that allows an unsophisticated mobile device user to create mobile web sites with personally-authored content for display on mobile devices. The invention requires "a content management site" and "mobile information channels" to address the challenge of limited display space and navigational capacities typical of web-enabled mobile devices, such as mobile telephones, personal digital assistants and palmtop computers. (Col. 1: ll. 22–31; Col. 2: ll. 4–14, 30–34.) "The content management site permits the user to enter information in accordance with a specified format comprising a plurality of selectable mobile information channels each corresponding to an information category." (Col. 4: ll. 58–61.) The '983 patent describes mobile information channels as channels that "allow unsophisticated users to easily and efficiently author message data or other types of information content to be made accessible via a collaborative workspace, a data mailbox, a collaborative community, or other type of mobile site or portion thereof generated or otherwise managed in the system." (Col. 7: ll. 51–56.) Examples of mobile information channels "suitable for use in the illustrative embodiment" set forth in the '983 patent include channels relating to contact information, "announcements, chat, events, guest book, diary/journal, bookmarks/links, discussion forum, survey/poll, . . . [or a] photo blog . . . ." (Col. 7: ll. 66–67; Col. 8: ll. 1–10.)

The inventors of the '983 invention were not the only individuals to create methods of accessing web site information content over mobile devices. Other prior-art systems are described in the "Background of the Invention." But, according to the patent, these systems do not enable users "to make specific personalized information content available via mobile devices to their friends, colleagues, subscribers or other entities" in a satisfactory manner. (Col. 1: ll. 37–39.) Significant drawbacks among the other systems include "a failure to provide suitable integration of messaging, collaboration, location-based services or other wireless networking functionality with the generation of shared information content." (Col. 1: ll. 46–49.) This prevents mobile device users from accessing a persistent version of shared information content upon which they could take further action. (Col. 1: ll. 49–52.) Other systems also require that the user possess sophisticated programming knowledge in order to employ them. (Col. 1: ll. 55–58.) Accordingly, the stated advantage of the present invention is that it "provides techniques for efficient generation and management of mobile sites that are advantageously integrated with wireless networking func-

tionality of a wireless network in a network-based communication system." (Col. 1: ll. 66–67; Col. 2: ll. 1–3.)

There are two main aspects of the '983 invention. The first discloses a method whereby information content is managed in a network-based communication system. (Col. 2: ll. 4–7.) This is accomplished by providing a content management site whereby a user can enter information in accordance with a specified format. (Col. 2: ll. 7–9.) The format is comprised of multiple selectable mobile information channels that correspond to an information category. (Col. 2: ll. 7–11.) After the user selects certain mobile information channels, "[t]he entered information is processed to generate for the user a mobile site comprising information content that is accessible via one or more mobile devices over a wireless network of the system." (Col. 2: ll. 7–14.)

The second aspect of the '983 invention discloses a method for integrating multiple actions of the wireless networking functionality with the information content of the mobile site. (Col. 2: ll. 25–30.) The actions which may be integrated with the information content of the mobile web site include a messaging action, a collaboration action and a location-based service action. (Col. 2: ll. 25–30.) A user can decide which information will be associated with the wireless networking functionality when modifying the mobile web site's content via the content management site. (Col. 2: ll. 30–34.)

Claim 1 describes a method for managing content on mobile web sites. (Col. 18: ll. 22–48.) It is the only independent claim at issue and teaches as follows:

A method for managing information content in a network-based communication system, the method comprising the steps of:

[1] providing a content management web site identified by a first uniform resource locator and accessible to a user of the communication system, the *content management web site* permitting the user *to author content to be added* to at least one of a plurality of predetermined selectable mobile information channels *and to select activation of particular ones of the plurality of* predetermined selectable mobile information channels, the content management web site comprising a web page listing the predetermined selectable mobile information channels with respective indications of *whether or not said channels have been activated by the user;* and

[2] generating a *mobile web site* identified by a second uniform resource locator different than the first uniform resource locator so as to allow the mobile web site to be accessed by a plurality of users independently of the content management web site via one or more mobile devices over a wireless network of the communication system, the mobile web site comprising a web page having *activatable links corresponding to respective ones of the predetermined selectable mobile information channels that have been activated by the user* through the content management web site.[2]

(Col. 18: ll. 21–48) (emphasis added.)

## THE ACCUSED PRODUCTS

The SAC alleges that defendants infringe Claims 1, 2, 3, 4, 6, 7, 9, 14 and 15 of

**2.** The terms construed by the Court at the Markman hearing are underscored. The

the '983 patent. (SAC ¶ 11.) To the extent any claim element is not literally met, plaintiff alleges Facebook and Google infringe these claims under the doctrine of equivalents. (SAC ¶¶ 28, 43–51.) For the purpose of the parties' cross-motion for judgment on the pleadings, all nonconclusory factual allegations are accepted as true. *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 100 (2d Cir.2009); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). All reasonable inferences are drawn in favor of the non-movant. *See United States v. City of New York*, 359 F.3d 83, 91 (2d Cir.2004).

### A. Facebook

Plaintiff alleges that the uniform resource locator (URL) www.facebook.com (herein referred to as "facebook.com") provided by Facebook is a "content management web site" that enables users to access and author content at various virtual locations, referred to by plaintiff as "mobile information channels." (SAC ¶ 12.) Plaintiff alleges that Facebook infringes Claim 1 of the '983 patent because after users author content at these virtual locations, Facebook permits users to "select activation of particular mobile information channels" at facebook.com by selecting different privacy settings to determine which channels are visible at the mobile web site. (SAC ¶ 12, 15, 21–25.) After author content is added and particular mobile information channels activated, Facebook then generates mobile web sites via second URLs where mobile device users can access the content contained within the mobile information channels. (SAC ¶¶ 25–27.) A visitor at the mobile web site is then able to access the content within that mobile information channel by selecting an "activatable link" at the mobile web site

that corresponds to the mobile information channel modified by the user. (SAC ¶ 27.)

The facebook.com web site "provides users with a variety of ways to author content, *i.e.,* write or create material and to select activation of particular mobile channels." (SAC ¶ 12.) For example, a facebook.com user may create author content by inputting information at various virtual locations at the facebook.com website, such as "birthday," "political views," "interested in," "looking for," "bio" and "favorite quotations." (SAC ¶ 15.) After the user authors this content and clicks the "Save Changes" button, this information is then visible at the "Info" portion of the facebook.com mobile web site unless the user opts to make this information private by utilizing the web site's privacy settings. (SAC ¶¶ 16, 21.) The author can view the information entered into these virtual locations by "activating" the "View My Profile" button at various locations on the content management site. (SAC ¶ 17.)

A user can also author content by entering information at a virtual location referred to as the "Wall." (SAC ¶ 18.) After text is entered into the "Wall" text box and the "Share" button is activated, user-authored content is then visible at the "Wall" location at the mobile web site. (SAC ¶ 19.)

In addition to entering user-authored information, users can also alter the mobile web site information by accessing and modifying the "Privacy Settings." (SAC ¶ 21.) Under these settings, a user can select whether the content at virtual locations, such as "birthday" or "bio and favorite quotations" described above, is available to "everyone," "only me," "friends only" or "friends of friends." (SAC ¶¶ 21–23.) Content need not be added to a virtual location before a user can select whether

Court's construction of these terms is attached at Appendix A.

this information is available at the mobile web site. (SAC ¶ 21.) Under the "Preview My Profile" button, a user can view how the mobile web site appears to mobile web site visitors and disallow other facebook.com users from posting content at the Wall. (SAC ¶ 24.)

After users enter the information as described above and/or edit the privacy settings, Facebook generates mobile web sites for access by mobile device users at second URLs, including m.facebook.com and touch.facebook.com. (SAC ¶ 26.) By selecting a link to the user's name, the visitor is directed to the user's web page "containing activatable links corresponding to both the 'Wall' and 'Info' where a visitor can access content made visible by the user of the content management web site." (SAC ¶ 27.)

Facebook.com users can also modify certain settings to control whether mobile web site visitors can view certain content and whether visitors can view certain activatable links. After a user registers and creates a facebook.com account, the "Info" link is then visible, regardless of whether the mobile information channel was activated by the user at the content management website. (SAC ¶¶ 13, 16–17.) The user-authored content within the "Info" activatable link, however, is only visible if a facebook.com "user has chosen to make it visible at the content management web site." (SAC ¶ 27.) Users can also adjust privacy settings to remove not just the content, but also the link that enables visitors at the mobile web site to access a user's "Wall." (SAC ¶ 22.) If a user chooses not to make the "Info" or "Wall" content visible at the content management web site, presumably by editing the privacy settings or the settings under the "Preview my profile," a mobile web site visitor cannot access the "Info" or "Wall" information. (SAC ¶¶ 15–16, 22, 27.) If a user

chooses to author content at facebook.com and adjusts the privacy settings accordingly, a mobile web site user can then select the "Info" or "Wall" link at the mobile web site to access the authored information. (SAC ¶¶ 21–22, 27.)

### B. Google

Plaintiff's allegations of patent infringement relating to Google parallel the allegations asserted against Facebook. Plaintiff alleges that Google provides a "content management website," "Google Buzz," which is accessible through the URL, www.google.com (herein referred to as "google.com"). (SAC ¶ 29.) Any user with a Google email account, commonly referred to as a Gmail account, can access "Google Buzz." (SAC ¶ 29.) At the "Google Buzz" web site, "a user can access various 'mobile information channels' or virtual locations at which user authored content may be added for transmission to a mobile web site." (SAC ¶ 29.) Although Gmail users "automatically have access to Google Buzz, users can choose to disable Google Buzz." (SAC ¶ 30.)

Users can author content, and thereby change what information is visible at the mobile web site, through several virtual locations. (SAC ¶ 30.) These locations include the "Buzz" tab, which directs a user to a "content management web site" that invites users to "[s]hare what you're thinking. Post a picture, video, or other link here." (SAC ¶ 31.) After a user authors content, the user must activate the "Post" button before the user-authored information becomes visible at the mobile web site. (SAC ¶ 33.)

Users can also author content by activating the "Edit" link, the "my Google profile" link, or the "Contact info" link and then entering information. (SAC ¶¶ 31–32, 34–35.) A user editing information under the "Contact info" link must also activate

the "Save changes" button in order to make the information visible at the mobile web site. (SAC ¶¶ 35–36.) Users can also select whether visitors at the mobile web site can view "content at the 'Contact [info]' channel...." (SAC ¶ 36.)

Google Buzz also has other features that enable a user to modify content at the mobile web site. By selecting the "Add" button, Google Buzz users can make content from "Connected Sites," such as Google Reader and Picassa, visible at the user's mobile web site. (SAC ¶¶ 37, 39.) After a user selects "Add" and connects these features, then additional content from these features are available at the user's mobile web site. (SAC ¶ 37.) The additional features also provide opportunities for users to add user-authored information. (SAC ¶ 38.) Picassa, for example, allows users to add user-authored text to photos in a "Description" box. (SAC ¶ 40.) Plaintiff asserts that "[a]t the very least, both 'Google Reader' and 'Picassa' are parts of the Google content management web site, and contain virtual mobile information channels." (SAC ¶ 40.)

After author-content is added or a user selects which information can be viewed by visitors at the mobile web site, Google generates a mobile web site at a second URL, m.google.com, which is designed to be accessed by mobile devices. (SAC ¶ 41.) Plaintiff asserts that "[t]he mobile web site is comprised of web pages having activatable links corresponding to the mobile information channels that were activated by the user at the content management website www.google.com." (SAC ¶ 42.) A visitor to the mobile web site can access the activated channels by selecting the user's name, then selecting either the

"Buzz" or "Contact" links. (SAC ¶ 42.) "No content is visible after selecting either 'Buzz' or 'Contact' unless the user has chosen to make it visible at the content management web site." (SAC ¶ 42.)

*DISCUSSION*

Motions for judgment on the pleadings pursuant to Rule 12(c), Fed.R.Civ.P., are considered under "the same standard as that applicable to a motion under Rule 12(b)(6)...." [3] *King v. Am. Airlines, Inc.,* 284 F.3d 352, 356 (2d Cir.2002) (quoting *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999)). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988) (citation omitted). Under Rule 12(c), Fed.R.Civ.P., the movant bears the burden of establishing "that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." *Juster Assocs. v. City of Rutland, Vt.,* 901 F.2d 266, 269 (2d Cir.1990) (citations omitted) (alterations in original).

Rule 8(a)(2), Fed.R.Civ.P., requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (ellipsis in original). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must provide the grounds upon which the claims rest, through factual allegations sufficient

---

**3.** The Federal Circuit applies the law of the regional circuit to procedural questions that are not particular to patent law. *See Madey v. Duke University,* 307 F.3d 1351, 1358 (Fed. Cir.2002). Accordingly, Second Circuit law governs the legal standard for dismissal under Rule 12(c).

to raise a right to relief above the speculative level. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1965). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" do not suffice to state a claim, as "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1949–50. The Supreme Court has described the motion to dismiss standard as encompassing a "two-pronged approach" that requires a court first to construe a complaint's allegations as true, while not bound to accept the veracity of a legal conclusion couched as a factual allegation. *Id.* Second, a court must then consider whether the complaint "states a plausible claim for relief," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* Although the Court is limited to facts as stated in the complaint, it may consider exhibits or documents incorporated by reference without converting the motion into one for summary judgment. *See Int'l Audiotext Network, Inc. v. AT & T,* 62 F.3d 69, 72 (2d Cir.1995). "The standard on a motion to dismiss also applies to a motion to dismiss a counterclaim pursuant to Rule 12(b)(6). . . ." *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.,* 531 F.Supp.2d 620, 622 (S.D.N.Y.2008).

Additional guidance as to what constitutes a sufficiently pled claim is set forth in Rule 84, Fed.R.Civ.P., which provides that "[t]he forms in the Appendix . . . illustrate the simplicity and brevity that these rules contemplate." "[T]he forms contained in the Appendix of Forms are sufficient to withstand attack under the rules under which they are drawn, and . . . the practitioner using them may rely on them to that extent." Rule 84 Advisory Committee Note (1946 amendment). Form 18 in the Appendix of Forms, entitled "Complaint for Patent Infringement," provides an example for alleging patent infringement that requires little more than a statement that the defendant infringed the plaintiff's patent. Form 18 is reproduced below:

(Caption—See Form 1.)

1. (Statement of Jurisdiction—See Form 7.)

2. On *date,* United States Letters Patent No. _____ were issued to the plaintiff for an invention in an *electric motor.* The plaintiff owned the patent throughout the period of the defendant's infringing acts and still owns the patent.

3. The defendant has infringed and is still infringing the Letters Patent by making, selling, and using *electric motors* that embody the patented invention, and the defendant will continue to do so unless enjoined by this court.

4. The plaintiff has complied with the statutory requirement of placing a notice of the Letters Patent on all *electric motors* it manufactures and sells and has given the defendant written notice of the infringement.

Therefore, the plaintiff demands:

(a) a preliminary and final injunction against the continuing infringement;

(b) an accounting for damages; and

(c) interest and costs.

(Date and sign—See Form 2.)

Fed.R.Civ.P., App. of Forms, Form 18.

As this Court has previously explained, "[a] plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." *Suthers v. Amgen Inc.*, 441 F.Supp.2d 478, 482 (S.D.N.Y. 2006) (quoting *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir.1995)); *Goonewardena v. New York*, 475 F.Supp.2d 310, 320 (S.D.N.Y.2007); *see also McKeown v. City of Chicago*, 2001 WL 59034, at *5 (N.D.Ill. Jan. 19, 2001) (explaining in a patent infringement action that the defendant "has effectively plead [sic] himself out of court based on the facts plead [sic] and uncontested in [the] complaint" because the facts asserted in the complaint "undermine[d] the allegations set forth in [the] complaint.")

 In an infringement action, the court must first determine the scope and meanings of a patent claim and then compare the properly construed claim to the allegedly infringing device. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998). Claim construction presents a question of law to be decided by the Court, whereas the issue of whether the claim covers the alleged infringer's product or process is a question of fact. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

 Direct infringement of a patent requires a party to perform all of the steps of the patented method. *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed.Cir.2007) ("Direct infringement requires a party to perform or use each and every step or element of a claimed method or product."); *Canton Bio–Medical, Inc. v. Integrated Liner Technologies, Inc.*, 216 F.3d 1367, 1369–70 (Fed.Cir.2000)

("Infringement of process inventions is subject to the 'all-elements rule' whereby each of the claimed steps of a patented process must be performed in an infringing process....") Therefore, if even one limitation is not present in the accused product, a finding of non-infringement is required. *See e.g., Digital Biometrics v. Identix, Inc.*, 149 F.3d 1335, 1349 (Fed.Cir. 1998) ("An accused device cannot infringe, as a matter of law, if even a single limitation is not satisfied.")

*APPLICATION*

Defendants do not argue that the allegations set forth in the SAC lack sufficient detail to satisfy Rule 8(a). (Defs. Reply 1.) Rather, they argue, in essence, that their motion should be granted because (1) plaintiff has alleged extensive facts showing how the accused products allegedly infringe, and its failure to include certain facts that are critical to it prevailing on any of its claims is indicative of its inability to show that the accused products satisfy these limitations, and (2) the allegations set forth in the SAC affirmatively demonstrate that the SAC cannot infringe. (Defs. Mem. in Supp. 1; Defs. Reply 1.)

Many of defendants' arguments with respect to why the SAC demonstrates that the accused products do not infringe assume that the allegations set forth in the SAC describe in exacting detail every feature of the accused products and how the accused products satisfy each Claim 1 limitation. However, a plaintiff alleging patent infringement need not meet such a high standard to survive a motion to dismiss, or as here, a motion for judgment on the pleadings, and the Court cannot conclude that the facts alleged in the SAC are the only facts plaintiff will uncover during discovery that will support its claims. As explained more fully below, defendants' motion is denied because the Court is not

persuaded by defendants' first argument and defendants have not shown that the facts set forth in the pleadings are inconsistent with a viable claim for patent infringement.

### A. The SAC Satisfies the Rule 8(a) Pleading Requirements

Defendants argue that the claims should be dismissed because plaintiff "fails to plead that [d]efendants' products permit the user to select mobile information channels in order to make them visible 'at the mobile web site,' as required by [the] Court's construction." (Defs. Mem. in Supp. 8.) They posit that the SAC simply "describes generic customization settings of the accused Facebook and Google websites that enables users to select which other users can and cannot view certain personal information (i.e., content)" at any web site and fails to set forth how the selection of anything at the content management web site is specific to the accused *mobile* web sites. (Defs. Mem. in Supp. 8–9.)

■ The SAC states a claim for relief, despite its failure to specify how each Claim 1 limitation is satisfied by the accused products. *See McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed.Cir. 2007) (citing *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.*, 203 F.3d 790, 794 (Fed.Cir.2000)) (applying Fifth Circuit law and concluding that "a plaintiff in a patent infringement suit is not required to specifically include each element of the claims of the asserted patent" in the complaint). The SAC alleges that the '983 patent was issued on October 6, 2009, describes the patent, explains the features and functions of the allegedly infringing products, and states that plaintiff has been and remains the exclusive owner of all rights in the patent at issue. (SAC ¶ 1.) It further alleges that defendants have and

continue to infringing the '983 patent by using the patented method in managing their web sites. (SAC ¶¶ 2, 12, 29.) The SAC alleges that the Winksite web site, the web site managed by plaintiff, was marked with the '983 patent number the day the patent was issued and describes in detail other facts describing how defendants had notice of the '983 patent. (SAC ¶¶ 54, 59.) The SAC also includes a prayer for relief. (SAC ¶¶ 79A–79H.) These allegations are sufficient to state a claim for patent infringement sufficient to survive a motion for judgment on the pleadings.

### B. The Facts Set Forth in the Pleadings Do Not Affirmatively Demonstrate that the Accused Products Cannot Infringe

Defendants' second argument is that plaintiff's recital set forth in the SAC of how facebook.com and google.com work affirmatively demonstrate that these products cannot meet every limitation of Claim 1, the only independent claim allegedly infringed by the accused products. (Defs. Mem. in Supp. 7–8.) Defendants' position is premised on two main points. The first is that the facts alleged in the SAC demonstrate that "[n]o action or inaction by the user [at the content management web site] affects whether the [activatable] links are present at the mobile web site." (Defs. Mem. in Supp. 8.) They posit that the SAC "asserts that the alleged 'activatable links' at the mobile web site are visible even though the user has done nothing to turn them on, and even if no content is present in the alleged channels." (Defs. Mem. in Supp. 7) Defendants argue that this shows the accused products fail to satisfy two Claim 1 limitations: the accused products (1) do not provide a content management web site where a user can "select activation of particular ones of the plurality of predetermined selectable mobile informa-

tion channels" and (2) they do not, under defendants' interpretation of this Court's claim construction, generate a "mobile web site" that has "activatable links corresponding to respective ones of the predetermined selectable mobile information channels that have been activated by the user." (Defs. Mem. in Supp. 8, 10.) According to defendants, pursuant to this Court's claim construction, "only those channels that have been turned on [by a user at the content management web site] will have 'activatable links' at the 'mobile' web site." (Defs. Mem. in Supp. 4.)

In response, plaintiff disputes defendants' interpretation of this Court's claim construction. According to plaintiff, activating a particular mobile information channel makes *content* visible and a channel is "visible" when people other than the user activating the channel can see the content, not just the link. (Pl. Mem. in Opp. 13–14, 18–19.) Plaintiff also asserts that even if this Court did construe the term as defendants argue it did, the SAC does not plead facts demonstrating that the accused products cannot infringe. (Pl. Mem. in Opp. 21.) This is because certain activatable links associated with mobile information channels on facebook.com and google.com, such as the "Wall" link on facebook.com, are not always visible—users can also choose whether to make the link visible, and not just the mobile information channel content visible. (Pl. Mem. in Opp. 21.)

Defendants' second main point as to why the allegations set forth in the SAC demonstrate that the accused products do not infringe is that, as described in the SAC, the mobile web sites generated by defendants are no different than the web sites visible to anyone on any web site and the user modifications at the "content management web site" "have nothing to do with generating specific mobile web sites, let alone choosing which 'mobile information

channels' will be visible on them." (Defs. Mem. in Supp. 14–15.)

### 1. Claim Construction

On October 21, 2010, this Court conducted a claim construction hearing and construed the meaning of the disputed terms in Claim 1 of the '983 patent. (Tr. 10/21/10.) Claim 1 comprises two steps and my claim construction reflects the distinction between these two steps. Step one generally addresses the actions a user may employ at the content management web site to write or create material and activate certain mobile information channels. (Col. 18: ll. 26–36.) Step two generally addresses the web provider generating a mobile web site based upon the information entered by the user at the content management web site in step one. (Col. 18: ll. 37–47.) During the claim construction hearing, this Court construed the step-one phrase "select activation of particular ones of" to mean "choose which of two or more *mobile information channels* will be visible" (Tr. 47:23–24) "at the mobile web site." (Tr. 48:10.) I also construed the step-one language "whether or not said channels have been activated by the user" to mean "whether or not the user has chosen such *mobile information channels* to be visible at the mobile web site." (Tr. 50: 23–24.)

With respect to the terms in step two of Claim 1, which addresses generating a mobile web site, I construed "activatable links corresponding to respective ones of predetermined selectable mobile information channels that have been activated by the users" to require that "the *links* on the mobile web site match those mobile information channels that a user has turned on." (Tr. 55: 19–20.) I did not construe the term to require that the activatable *links* on the mobile web site match the *predetermined mobile information channels* on the content management web site; instead I construed it to require that the

activatable *links* at the mobile web site match the *mobile information channels* that a user *turned on* at the content management web site. (Tr. 51–56.) None of the parties had any objections pertinent to the parties' conflicting interpretation of the Court's construction at the claim construction hearing.[4] (Tr. 56.) This construction is consistent with the plain meaning of the language in Claim 1 and the stated purpose of the invention, which was, at least in part, to address the challenge of "limited display space and navigational capacities" of web-enabled mobile devices. (Col. 1: ll. 32–36.) Having received no persuasive argument to modify this construction, I decline to modify it at this juncture. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.,* 302 F.3d 1352, 1361 (Fed.Cir.2002) ("District courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.") I also decline to construe its meaning further for the purposes of this motion because even if I accept defendants' claim construction position as the governing interpretation, defendants still have not demonstrated that the facts alleged are inconsistent with a finding of patent infringement.

2. The Pleadings Do Not Show that Plaintiff Pled Facts Demonstrating that the Activatable Links that have Corresponding Mobile Information Channels at the Content Management Web Site Managed by Facebook Are Always Visible at the Mobile Web Site

With respect to Facebook, defendants argue that the SAC "pleads that Facebook links for 'Info' and 'Wall' (the [only] alleged 'mobile information channels') are visible and can be used even if the user never selected them to be visible." (Defs. Mem. in Supp. 14.) Based on these allegations, defendants assert that Facebook cannot meet the claim limitations outlined above. (Defs. Mem. In Supp. 14.) In making this assertion, defendants refer to Paragraph 27 of the SAC. Paragraph 27 states, in relevant part:

A visitor to the mobile web site can select a link to the user's name. This, in turn, takes the visitor to the user's web page containing activatable links corresponding to both the 'Wall' and 'Info' where a visitor can access *content* made visible by the user of the content management web site. No 'Info' or 'Wall' *information content* is visible after selecting either 'Wall' or 'Info' for visitors to the mobile web sites unless *the user has chosen to make it visible* at the content management web site.

(SAC ¶ 27; Defs. Mem. in Supp. 14) (emphasis as reflected in defendants' memorandum.) Although these facts may indicate that a user can only modify the content associated with these activatable links, the SAC, however, also alleges that facebook.com users can also choose whether to make "even the link to the [Wall] location" visible. (SAC ¶ 22.) Plaintiff does not concede that these are the only mobile information channels present on the accused products. Thus, based solely on the facts set forth in the pleadings, it is not clear that the activatable links that have corresponding mobile information channels at

---

4. Attorney for plaintiff stated "I don't have any problem with saying there have to be links on the mobile web site that match the channels that have been turned on ... as long as by match you don't mean you can't have other links." (Tr. 56: 5–8.) He also stated with respect to this construction that "without conceding the construction of activation ... I ... don't have any specific comment on your construction." (Tr. 56: 11–14.)

the content management web site managed by Facebook are always visible at the mobile web site. Of course, plaintiff need not specifically allege how each claim limitation is present in the accused products in order to state a claim for relief. *See McZeal*, 501 F.3d at 1357 (citing *Phonometrics, Inc.*, 203 F.3d at 794)(concluding that "a plaintiff in a patent infringement suit is not required to specifically include each element of the claims of the asserted patent" in the complaint).

3. The Pleadings Do Not Show that Plaintiff Pled Facts Demonstrating that the Activatable Links that have Corresponding Mobile Information Channels at the Content Management Web Site Managed by Google Are Always Visible at the Mobile Web Site

Similar to defendants' argument with respect to Facebook, defendants argue that facts alleged in the SAC demonstrate that the only two mobile web site links with corresponding mobile information channels on google.com, those for "Buzz" and "Contact," are always visible at the mobile web site, regardless of any action taken by the user at the content management web site. (Defs. Mem. in Supp. 10–11.) According to defendants, the facts set forth in paragraph 42 of the SAC demonstrate that a Google user may edit the "Buzz" or "Contact" mobile information channels for content, but a user may not select whether the corresponding activatable links are visible at the mobile web site, as this Court construed Claim 1 to require. (Defs. Mem. in Supp. 10–11.)

Paragraph 42 of the SAC states:

The activated channels can be accessed, for example, by selecting the user's name. This, in turn, takes a mobile web site visitor to the user's web page containing activatable links corresponding to both 'Buzz' and 'Contact' where a visitor *can access content* if it has been made visible by the user of the content management web site. No content is visible after selecting either 'Buzz' or 'Contact' unless the user has chosen to make it visible at the content management web site.

(SAC ¶ 42)(emphasis added.) While these facts may indicate that the "Buzz" and "Contact" links are always visible at the mobile web site, it is not clear from the pleadings that google.com users cannot otherwise control whether these links are visible at the mobile web site, *e.g.*, by "choos[ing] to disable Google Buzz." (SAC ¶ 30.) Plaintiff alleges that "Google Buzz provides several virtual locations that allow a user to author content" and "[d]ifferent methods are used to allow the user to make those virtual locations visible at the mobile web site." (SAC ¶ 30.)

It is also not clear from the pleadings that the "Buzz" and "Contact" links are the only activatable mobile web site links that have corresponding mobile information channels and plaintiff does not concede that they are the only ones present in Google's accused products. Plaintiff also pleads facts relating to links associated with the "Connected Sites" feature, which allows google.com users to connect virtual locations for "Google Reader and Picassa, among others" to a user's mobile web site. (SAC ¶ 37.) The facts set forth in the SAC can be construed such that the mobile web site links associated with the Connected Sites feature have corresponding mobile information channels at the content management web site that a user can activate to make the links associated with these sites visible on the mobile web site. The SAC alleges that "Google Buzz also has a 'Connected Sites' feature which allows the user to select virtual locations to be made visible at the mobile website.... Only

when these 'sites' are connected is the content at the 'connected sites' visible." (SAC ¶ 37.) The pleadings do not clarify whether the links are made visible on the mobile web site when the features are connected or if it is just the content that is thereby made visible. Thus, the facts set forth in the pleadings do not show that the activatable links that have corresponding mobile information channels at the content management web site managed by Google are always visible at the mobile web site.

4. The Pleadings Do Not Show that the Content Management Web Site Is Unrelated to Generating A Mobile Web Site

Defendants also argue that the facts set forth in the pleadings demonstrate that 1) user modifications at the "content management web site" "have nothing to do with generating specific mobile web sites, let alone choosing which 'mobile information channels' will be visible on them" and 2) the mobile web site generated by defendants is no different than the web site visible to anyone on any web site. (Defs. Mem. in Supp. 14–15.)

As to defendants' first point, the allegations set forth in the SAC do not affirmatively demonstrate that plaintiff cannot prevail on its infringement claims. While the SAC may not show how certain claim limitations are satisfied, the SAC does not allege any facts inconsistent with plaintiff's ability to show at trial how certain claim limitation are satisfied. The SAC alleges that the accused products generate mobile web sites for access by mobile device users after a user enters information at the content management web site. (SAC ¶¶ 26, 41.) It also alleges that the mobile web sites generated by the accused products are "comprised of web pages having activatable links corresponding to the mobile information channels that were activated

by the user at the content management website...." (SAC ¶¶ 27, 42.) The SAC does not allege any facts that are inconsistent with the existence of a viable claim that the accused products infringe the '983 patent.

Even if the allegedly infringing products also create a non-mobile web site that is identical to the mobile web site, additional elements or steps in an allegedly infringing product do not necessarily mean that a product does not infringe a patent where, as here, the patent claim uses the term of art "comprising" to delineate the required steps. *See Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed.Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."); *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed.Cir.1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.")

Because plaintiff's claims satisfy the pleading standard and defendants have not shown that the facts set forth in the SAC precludes plaintiff from prevailing on its infringement claims, defendants' motion for judgment on the pleadings is denied.

*DEFENDANTS' COUNTERCLAIMS RELATING TO PATENT INVALIDITY ARE DISMISSED; PLAINTIFF'S MOTION TO STRIKE IS DENIED*

Defendants assert multiple affirmative defenses in their Answers, including: 1) non-infringement, 2) invalidity, 3) failure to state a claim, 4) failure to plead irreparable harm, 5) failure to mark pursuant to 35 U.S.C. § 287, 6) unclean hands, 7) estoppel, and 8) no willful infringement. (Facebook Answer ¶¶ 1–9; Google Answer ¶¶ 80–92.) Defendants also assert counterclaims seeking a declaration of 1) nonin-

fringement and 2) invalidity and unenforceability. (Facebook Answer ¶¶ 10–19; Google Answer ¶¶ 93–105.)

Plaintiff moves for judgment on the pleadings regarding defendants' counterclaims seeking a declaration of invalidity. (Pl. Mem. in Opp. 22–25.) Plaintiff also moves to strike "each and every claim or defense relating to invalidity asserted by either [d]efendant." (Docket # 67.) Plaintiff argues that its motion should be granted because the defendants' counterclaims and invalidity affirmative defense fail to plausibly allege that the '983 patent is invalid. (Pl. Mem. in Opp. 24–25.)

### A. Invalidity Counterclaims

■ Facebook alleges that "[t]he '983 patent and each claim thereof are invalid for failing to comply with the provision of the United States patent laws, including one or more of 35 U.S.C. §§ 101, *et seq.*" (Facebook Answer ¶ 19.) Google alleges that "[t]he claims of the '983 patent are invalid and/or unenforceable for failure to meet the conditions of patentability set forth in the Patent Laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, *et seq.*" (Google Answer ¶ 97.)

As explained above, counterclaims must comply with Rule 8(a) and be pled in the same manner as claims. *Aspex Eyewear, Inc.*, 531 F.Supp.2d at 622. The allegations fail to show why the pleader is entitled to a declaration of invalidity of the '983 patent. Defendants allege that the '983 patent fails to comply with certain provisions of the United States patent laws. This statement is wholly conclusory and fails to satisfy Rule 8(a). *See Iqbal*, 129 S.Ct. at 1949–50 (a court is not bound

to accept the veracity of a legal conclusion couched as a factual allegation). Plaintiff's motion to dismiss defendants' counterclaims relating to patent invalidity is therefore granted. *See Aspex Eyewear, Inc.*, 531 F.Supp.2d at 623 (dismissing similarly pled patent invalidity counterclaims for failure to satisfy the Rule 8(a) pleading standard); *Boehringer Ingelheim Vetmedica, Inc. v. Merial, Ltd.*, 2010 WL 174078, at *17 (D.Conn. Jan. 14, 2010) (concluding that similar allegations failed to provide fair notice).

### B. Invalidity Affirmative Defense

■ The allegations relating to defendants' invalidity affirmative defense largely mirror the invalidity counterclaims asserted by defendants. Google's invalidity affirmative defense states that "[e]ach of the claims of the '983 patent is invalid, unenforceable, and/or void for failing to comply with one or more of the requirements for patentability under the Patent Laws of the United States, including but not limited to, 35 U.S.C. §§ 101, 102, 103, 112 *et seq.*" (Google Answer ¶ 81.) Facebook's affirmative defense of invalidity provides that "[o]n information and belief, one or more of the claims of the '983 patent are invalid for failure to satisfy the conditions for patentability set forth in 35 U.S.C. §§ 101, *et seq.*" (Facebook Answer ¶ 2.)

■ Rule 12(f), Fed.R.Civ.P., provides that, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Motions to strike are viewed with disfavor and [are] infrequently granted." *RSM Prod. Corp. v. Fridman*, 643 F.Supp.2d 382, 394 (S.D.N.Y.2009).[5]

---

**5.** At least one court in this district has relied in part on *Shechter v. Comptroller of New York*, 79 F.3d 265 (2d Cir.1996) to strike an

affirmative defense where the elements of the affirmative defense were not alleged and no facts were alleged to support the defense. *See*

The Second Circuit has instructed that, as a general proposition, "courts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.1976). "A motion to strike an affirmative defense under Rule 12(f), Fed.R.Civ.P. for legal insufficiency is not favored and will not be granted 'unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.'" *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir.1984), vacated on other grounds by 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986) (quoting *Durham Industries, Inc. v. North River Insurance Co.*, 482 F.Supp. 910, 913 (S.D.N.Y.1979)). "[A] motion [to strike] should be granted if substantial questions of law or fact do not exist and if the insufficiency of the defense is clearly apparent on the face of the pleading." *Nat'l Acceptance Co. of Am. v. Regal Prods., Inc.*, 155 F.R.D. 631, 634 (E.D.Wis.1994).

■ Here, it is not apparent on the face of the pleadings that the affirmative defense of patent invalidity, as pled by defendants, is insufficient. Patent invalidity, if proven, is a legally sufficient defense to patent infringement. The allegations also satisfy Rule 8(e), Fed.R.Civ.P., which requires a pleader to "state" an affirmative defense. Thus, plaintiff's motion to strike defendants' affirmative defense of invalidity is denied. *But see Aspex Eyewear, Inc.*, 531 F.Supp.2d at 622–23 (striking invalidity affirmative defense because it "fail[ed] to meet the minimal requirements of notice pleading under" Rule 8(a)).

## CONCLUSION

For the reasons explained above, defendants' motion for judgment on the pleadings (Docket # 62) is DENIED. Plaintiff's motion (Docket # 67) is GRANTED insofar that the counterclaim seeking a declaration of invalidity is dismissed and otherwise is DENIED.

SO ORDERED.

## APPENDIX A

| *Disputed Term* | *Court's Construction* |
| --- | --- |
| content management web site | "a web site that allows a user without programming to author content, i.e., write or create material and to select activation of |

*Aspex Eyewear, Inc.*, 531 F.Supp.2d at 622–23 (striking an affirmative defense of patent invalidity). In *Shechter,* the Second Circuit stated that "[a]ffirmative defenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy." *Shechter,* 79 F.3d at 270. The court in *Shechter* upheld a district court's denial of defendants' motion for judgment on the pleadings based on the affirmative defense it pled in its answer—qualified immunity. *Id.* at 267. The affirmative defense asserted by the defendants in *Shechter* was a "bald assertion [that] provide[d] no basis for a ruling in [the defendants'] favor." *Id.* at 270. The defendants failed to plead "even bare allegations" that

the specific acts at issue were performed within the scope of their official duties, as required to prevail on a qualified immunity defense—they only pled that "[t]he defendants were, at all times relevant to the amended complaint, government officials immune from suit under both the doctrines of absolute and qualified immunity." *Id.* The court did not address the standard for striking an affirmative defense. Pleading that the defendants were government officials and that they were therefore entitled to qualified immunity did not entitle defendant to a judgment on the pleadings; the court did not state that this would also be grounds to strike the defense under Rule 12(f), Fed.R.Civ.P.