Filed 10/17/24  Daley v. The Regents of the U. of Cal. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ALYCESUN DALEY,<br><br>      Plaintiff and Appellant,<br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>      Defendants and Respondents. | A165440<br><br>(San Francisco City & County Super. Ct. No. CGC-15-544501)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on September 25, 2024, be modified as follows:

On page 24 of the opinion, at the end of the last sentence in Part II that reads "Given the totality of the evidence, we find no reasonable probability that Daley would have obtained a more favorable result if the NIH Evidence had been admitted," the following footnote 9 is added:

9 Daley argues that, "[i]f the Trial Court's exclusion of NIH Study evidence stands, human research participants are essentially deprived of the protections in legal actions of the very protocols and safety oversight in place for their protections." ~(AOB 66)~ The harmless error question, however, turns not on public policy but on whether it is reasonably probable that the

1

error affected the outcome of Daley's case in particular. We conclude there is no such probability. Moreover, Daley has not established that such a policy has been abridged, given the similarities between the consent form that the jury considered and the protocols and safety oversight Daley cites.

The modification effects no change in the judgment.

The petition for rehearing is denied.

Date:　　10/17/24　　　　　　　　　　　　　　　　Jackson　　　　　　, P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ALYCESUN DALEY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | A165440<br><br>(San Francisco City & County Super. Ct. No. CGC-15-544501) |

Plaintiff and appellant Alycesun Daley, suffering from twin-twin transfusion syndrome (TTTS), consented to participate in a study sponsored by the National Institutes of Health (NIH).  Under the auspices of the study, defendants and respondents performed two surgeries on Daley, using a treatment known as selective fetoscopic laser photocoagulation (SFLP).  After the surgeries, Daley's twins died.  Daley sued respondents, alleging that (1) the NIH protocol for the SFLP surgery called for a percutaneous approach and a four-millimeter trocar, rather than the laparotomy, hysterotomy, and five-millimeter trocar used by respondents, and (2) because respondents' procedure was substantially different than the one to which she consented, respondents were liable for medical battery and intentional infliction of emotional distress.  A jury returned a verdict for respondents.  Daley appeals, contending the trial court erred in excluding evidence of the NIH protocol and

1

related material.  Because Daley has not established reversible error, we will affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

### A.  Daley's Complaint

Daley filed a complaint alleging battery and intentional infliction of emotional distress against defendants and respondents Diana Farmer, M.D., Hanmin Lee, M.D., Robert Ball, M.D., and their employer, The Regents of the University of California.

Daley alleged that she agreed to participate in a NIH trial study that compared treatments for TTTS.  One of those treatments, SFLP, involved the entry of a trocar (tube) percutaneously (through the skin), the passage of a fetoscope through the trocar to provide visibility inside the uterus, and the use of a laser to photocoagulate (seal) certain blood vessels.  Respondents, however, allegedly performed a "substantially different procedure" on her, using an open laparotomy and open hysterotomy, in which the fetoscope was inserted by cutting open Daley's abdomen and exposing the uterus.  Respondents also used a trocar measuring five millimeters in diameter, which was larger than the instrument required by the NIH protocol.  Daley alleged that respondents' approach was the proximate cause of the death of her twin fetuses.

### B.  Dismissal by the Trial Court and Reversal on Appeal

In October 2017, the trial court dismissed Daley's claims on the ground they were time-barred under Code of Civil Procedure section 335.1.  Daley appealed (No. A153501).  We reversed, holding that the court erred in concluding that the discovery rule did not apply to medical battery claims as a matter of law.  (*Daley v. The Regents of the University of California* (2019) 39 Cal.App.5th 595, 606–607.)  In the unpublished portion of our opinion, we

ruled that Daley's claim for intentional infliction of emotional distress could also proceed.

C.  Trial after Remand

Trial by jury involved two phases.  In phase 1, the jury rejected respondents' statute of limitations defense.  Phase 2, at issue here, addressed liability, causation, and damages.

1.  Respondents' Motion in Limine to Exclude NIH Evidence

In June 2021, before phase 2 began, respondents served their "MIL No. 4 [¶] Omnibus Motion in Limine to Exclude Evidence Regarding the NIH Trial Proceedings and Documents."  (Capitalization and boldface omitted.)

The motion sought to exclude evidence regarding the NIH TTTS study (NIH Evidence), primarily on the ground that the material was irrelevant to Daley's causes of action because (among other things) Daley had not seen the material by the time of her surgery and it thus had no bearing on the nature of the surgery to which she consented.  In addition to seeking exclusion of the NIH grant application, funding, income, and authorship credit, it sought to exclude the following (as characterized by Daley):  (1) the NIH working protocol for the study (Protocol), which specifies that the surgery was to be percutaneous and involve a four-millimeter trocar;[1] (2) adverse event reports concerning the surgeries performed on Daley, as well as a report of a protocol deviation regarding the need for a second surgery; (3) Dr. Farmer's and Dr. Ball's acknowledgement, after the death of the twins, that the use of larger

---

[1] The Protocol stated:  "Although almost all procedures can be performed by a single *percutaneous* port, some cases with anterior placentas may require a second port or even a laparotomy to expose the surface of the uterus.  We expect this to be necessary in fewer of 10% of cases.  A 4-mm incision is made in the skin to allow ultrasound-guided placement of a *4-mm trocar* into the amniotic cavity."  (Italics added.)

3

instruments and laparotomies at the University of California, San Francisco (UCSF) was problematic; and (4) documentation that the NIH study was paused and respondents were to obtain training and smaller instruments before it would be resumed.

Daley opposed respondents' motion, noting that respondents were required to follow the NIH protocol and arguing the relevance and importance of the evidence to her battery claim, causation, and the outrageous nature of respondents' conduct.

The trial court first heard respondents' motion in December 2021. The court permitted supplemental briefing, announced a tentative ruling that the evidence was irrelevant, and held multiple hearings thereafter. At a hearing on February 28, 2022, Daley's counsel argued that Daley had surgery at UCSF only because of the NIH study and believed there was a protocol (presumably approved by NIH) that UCSF would follow.

By written order filed on March 3, 2022, the trial court granted respondents' motion, "subject to a further showing by [Daley] as to the relevance and admissibility of any of the 181 NIH documents identified on [Daley's] Exhibit List." The court ruled that "[t]he NIH documents are irrelevant." It also observed, for purposes of Evidence Code section 352, that it had "weighed the probative value of the evidence against the admissibility" and found that "the admission of the NIH documents would necessitate undue consumption of time, create substantial danger of undue prejudice, confuse the issues, and mislead the jury." The court explained: "The only documents [Daley] saw at the time of entering into the NIH study and at the time of her procedures were (1) a pamphlet of information provided by the University of Utah; (2) consent forms she signed when she enrolled in the NIH study at the University of Utah; [and] (3) . . . the preoperative consent

4

forms signed at UCSF. [Daley] never read any other NIH documents, nor was she aware of the content of any other NIH documents until after contacting an attorney some 12 years after the events which form the gravamen of this case. Accordingly, none of the remaining NIH documents can form the basis of her claims for medical battery and intentional infliction of emotional distress." Thus, despite Daley's argument that her consent form had referred to the NIH study, the fact that Daley was unaware of the Protocol until years after the surgeries meant it had "no relevance to what [Daley] consented to or whether the procedures performed were substantially different."

After yet further briefing and additional hearings in March 2022, the trial court maintained its view that the evidence was inadmissible, again noting that Daley never read the Protocol and had no knowledge of it.

  2. <u>Trial Testimony and Evidence</u>

   *a. Daley's Condition and Possible Treatments*

While pregnant in Utah, Daley was diagnosed with TTTS, a condition that can arise when fetal twins share a placenta. In some cases, a connection between the fetuses' blood vessels on the placenta results in uneven blood flow to the fetuses. Without treatment, nearly all such fetuses are lost.

One treatment for TTTS is amnioreduction, which removes fluid from the amniotic sac of one of the fetuses. Another treatment is SFLP, which uses a fetoscope, inserted in a trocar (tube) through the abdomen and into the uterus, to enable a surgeon to seal selected blood vessels on the placenta with a laser.

In discussions with physicians at the University of Utah, Daley learned of the NIH study comparing amnioreduction and SFLP in the treatment of TTTS. Hoping to save her twins, Daley agreed to participate in the study.

## *b. Daley's NIH Consent Form*

Daley signed a 12-page consent form entitled "A PROSPECTIVE RANDOMIZED MULTICENTER TRIAL OF AMNIOREDUCTION vs. SELECTIVE FETOSCOPIC LASER FOR THE TREATMENT OF TWIN-TWIN TRANSFUSION SYDROME [¶] RESEARCH CONSENT FORM" in Utah on July 28, 2003 (Consent Form).

The Consent Form explained that participants in the study would be randomly placed in one of two groups—one group would receive amnioreduction and the other would receive SFLP. The Consent Form described amnioreduction as a procedure during which "a needle [is used] to draw off fluid from the bag of water." It described SFLP as "the use of a laser beam to block or seal the vessels (photocoagulate) on the surface of the placenta so that the twins can no longer share the vessels," which is performed "using an instrument inserted through the mother's abdominal wall into the amniotic sac called a fetoscope."

The "Study Procedure" section of the Consent Form, under the heading "Selective Fetoscopic Laser Procedure," stated: "The procedure is performed in the operating room at [UCSF]. The abdomen is sterilely cleaned and draped . . . for an operation. A 4-mm (about 4 inches) incision is made in the skin to allow ultrasound-guided placement of a 4-mm narrow tube into the amniotic sac." The Consent Form further stated: "In rare instances in which we are unable to see the surface of the placenta, a [laparotomy] (opening of the abdomen) to expose the uterus may be necessary," usually because the placenta prevents proper placement of the fetoscope. "Typically, the procedure is performed through a [trocar] (narrow tube that is inserted into the amniotic sac) through which a fetoscope is passed."

6

The Consent Form included other disclosures, such as the risks and benefits of the surgery and alternative procedures. It further made numerous references to the NIH and advised that "[t]his study is sponsored by the National Institutes of Health and expects to enroll at least 150 women who have twin-twin transfusion syndrome."

Kristi Nelson, the nurse who reviewed the Consent Form with Daley when she signed it in Utah, testified that she would not have discussed with Daley "technically how the procedure would be done . . . [i]n other words, how the scope would make its way into the uterus."

### c. Assignment to UCSF for SFLP Treatment

Daley was assigned to the SFLP arm of the study and travelled to UCSF for the procedure. At trial, she acknowledged that the only documents she saw regarding the study were a brochure, the Consent Form, and UCSF consent forms she received before her two surgeries (discussed below). None of these documents identified a specific "protocol" for the procedure or mentioned the word "percutaneous."

At trial, Daley testified that she read the Consent Form thoroughly. It led her to believe that the surgeons would follow a protocol (presumably reviewed and approved by the NIH) and there was a 73 percent survival rate for her twins. The Consent Form's statement that Daley would give her confidential information to the NIH made her feel it was a "government contract" and there would be "checks" and "balances" and "committees." Because the Consent Form stated that all information regarding the treatment would go to the NIH, she felt "safe" and "secure." She trusted in the study and the "institution" and believed she would get the surgery described in the "NIH study form." Her counsel asked on direct examination, "Upon reading the consent form did you believe there would be protocols to be

7

followed at UCSF?" Daley answered: "I believe that they would follow protocol."

### d. Daley's First Surgery (Dr. Farmer)

Before the first surgery, Daley signed a UCSF consent form entitled "Authorization for Surgery or Special Diagnostic Therapeutic Procedure." (Capitalization and boldface omitted.) The form did not describe any details of the SFLP procedure.

Dr. Farmer, who was to perform the surgery, remembered discussing the surgery with Daley in person, because Daley was from Utah and Farmer hailed from Idaho, and it was unusual for Farmer to treat patients from another state. Consistent with her general practice, Farmer described the procedure to Daley in detail. Farmer testified: "I was very clear exactly how I was going to make the incision, exactly what I was going to do with her, that we were going to put in the scope and do a laser ablation. And that's exactly what we did." Farmer recalled telling Daley that she would make an incision, expose the uterus so they could insert the trocar, and insert the fetoscope so they could see the vessels. At trial, Daley did not deny having a conversation with Farmer, but she could not recall the specifics—just generally that respondents were going to "go in" and cauterize the blood vessels and that she was in good hands.

Dr. Ball testified that he had a "long discussion[]" with Daley before the first surgery because it was his practice to confirm there was "no confusion about what would be happening." He addressed risks, benefits, and alternatives to treatment, but due to his role as the maternal-fetal medicine specialist, he focused more on preoperative and postoperative care than on the surgery itself, which he likely discussed only in generalities. Daley recalled a discussion with Dr. Ball but not its content.

8

Daley testified that, by the time of the surgery, she understood the procedure would involve a cut in her abdomen and a hole or opening in her uterus. At trial, she denied understanding that the surgeons would decide how big a hole to make in her uterus, but respondents introduced deposition testimony that she hoped they would use her best interest and the twins' best interest in deciding how big the hole needed to be.

Dr. Farmer performed the surgery. She made a small incision in the abdomen wall that allowed her to see the surface of Daley's uterus, where Farmer wanted to place a trocar. Guided by ultrasound, she placed two stay sutures in the outer layer of the uterus to provide counter traction. Then she inserted the trocar through the uterine wall, using a type of trocar known as a "radially-expanding device," which enters with a diameter of about three millimeters and expands after insertion to over five millimeters. Farmer next inserted the fetoscope through the trocar to examine the placenta. Using the fetoscope and ultrasound for guidance, Farmer identified two blood vessels that were potentially connecting the fetuses and used a laser to coagulate them. Farmer was unable to complete the procedure, however, because blood in the amniotic fluid decreased visibility. Farmer withdrew the instruments, sutured the hole in the uterus, and closed the incision in the abdomen.

Dr. Farmer testified that she performed the procedure exactly as she described it to Daley. She denied that the procedure was different or more invasive than the procedure described in the Consent Form.[2]

---

[2] After Daley testified to her belief that UCSF would follow a protocol approved by NIH and Dr. Farmer testified as to what the Consent Form required, Daley's attorneys renewed their request that the Protocol be admitted into evidence. Counsel argued: "I should further add that . . . Daley testified that she believed there was a protocol that would be followed.

### e. *Daley's Second Surgery (Dr. Lee)*

Daley underwent a second (or "redo") surgery on August 7, 2023. Before this surgery, Daley signed another UCSF consent form similar to the one she signed before the first surgery. She also spoke with Drs. Farmer and Ball, similar to their discussions before the first surgery.

Performed by Dr. Lee, the second procedure was essentially the same as the first procedure performed by Dr. Farmer. The second procedure was successful.[3]

### f. *Daley's Chorioamnionitis and Death of the Twins*

Daley returned to Utah. Several weeks later, she developed E. coli chorioamnionitis, resulting in preterm labor, rupture of membranes, and the demise of both twins. Daley introduced evidence that the chorioamnionitis was caused by the procedures performed at UCSF; respondents introduced evidence that it was not.

### g. *Daley's Expert (Dr. Quintero)*

Daley presented expert witness testimony from Ruben Quintero, M.D., who had "basically" developed the field of operative fetoscopy—the ability to treat fetuses in the womb with the use of a minimally invasive approach and very small instruments. Quintero was the first to describe the proper surgical technique, which was percutaneous—inserting the trocar through the skin without having to open the abdomen—as opposed to performing a

---

And so if . . . Daley believes there is a protocol and Dr. Farmer wants to take the position that the consent form is not precise enough, then we have very good evidence to give to the jury about what was supposed to be done to her, in the form of the protocol." Throughout the trial, Daley continued to urge the admissibility of the NIH evidence, to no avail.

[3] Dr. Ball did not perform the first or second surgery. He was in the operating room in case Daley had a complication directly related to her pregnancy or her own health.

laparotomy (an incision in the abdomen that allows the doctor to see inside with the naked eye) and a hysterotomy (an incision in the uterus).

Dr. Quintero opined that respondents performed an "entirely different" and more invasive procedure than what was described in the Consent Form, and that respondents' procedure caused the death of the twins. First, in Dr. Quintero's view, the Consent Form required a percutaneous approach, using a small incision like a "nick," which is less invasive than a laparotomy and hysterotomy because it disturbs the uterus less and presents less risk of bleeding. A laparotomy and hysterotomy entail large incisions, are not described on the Consent Form, and resulted in moderately bloody amniotic fluid. Second, respondents used a five-millimeter instrument—larger than the four-millimeter instrument described in the Consent Form—which tears the muscle and causes bleeding. Third, the procedure performed by respondents takes longer than the percutaneous approach. Fourth, respondents' placement of stay sutures in the uterus at the trocar insertion site was more invasive and provided another reason respondents' procedure was totally different.

Dr. Quintero admitted that puncturing the uterus with a four-millimeter trocar (that was not radially expanding) can create a hole in the uterus up to six or seven millimeters. Respondents' counsel challenged Quintero's opinions about the cause of Daley's chorioamnionitis, eliciting that Quintero was not board certified and did not serve a residency or fellowship in infectious disease or pathology. Quintero was unaware of any study evaluating whether the use of a five-millimeter trocar rather than a four-millimeter trocar increased the risk of chorioamnionitis.

11

*h. Respondents' Expert (Dr. Walker)*

Respondents presented expert witness testimony from Martin Walker, M.D., the co-director of the Maternal-Fetal Intervention and Surgery Program at Seattle Children's Hospital. Walker had performed nearly 600 SFLP procedures to treat TTTS.

Dr. Walker opined that the procedures Daley received were "no different" than what was described in the Consent Form and "no more invasive than [what] would have been discussed with her before surgery."

Dr. Walker testified that the Consent Form broadly described the SFLP procedure and included references to the risks of infection, bleeding, membrane separation, and pregnancy loss. Walker opined that the use of the radially expanding trocar did not increase the risk of membrane separation or membrane rupture. When it penetrated the uterus, the radially expanding trocar was smaller than four millimeters. Nor did the trocar increase the risk of E. coli chorioamnionitis, which was the undisputed cause of Daley's preterm labor, premature rupture of membranes, and demise of the fetuses.

By stipulation of the parties, the jury was instructed that they had to accept as true that "Daley was part of the NIH Trial during her procedures at UCSF."

### 3. Jury Verdict for Respondents

The jury returned a verdict for respondents on both causes of action. On the battery claim, the jury found that respondents did not perform a medical procedure without Daley's consent or perform a procedure that was substantially different than that to which Daley consented. On the intentional infliction of emotional distress claim, the jury found that

12

respondents' conduct was not outrageous. Judgment was entered for respondents. Daley timely appealed.[4]

## II. DISCUSSION

Daley contends the trial court erred by excluding the NIH Evidence on the ground it was irrelevant to her claims under Evidence Code section 210 and inadmissible under Evidence Code section 352. We conclude that, even if the court erred, the error was harmless.

### A. Medical Battery

The jury was instructed, pursuant to CACI No. 530A, that the elements of medical battery are (1) the defendant performed a medical procedure without the patient's consent, or the patient consented to one medical procedure, but the defendant "performed a substantially different medical procedure"; (2) the patient was harmed; and (3) the defendant's conduct was a substantial factor in causing the harm.[5]

As respondents emphasize, medical battery is distinguishable from negligence, which Daley did not allege. Battery arises "[w]here a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained." (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 239 (*Cobbs*) [e.g.,

---

[4] Respondents filed a cross-appeal but elected not to pursue it.

[5] Daley's other claim for intentional infliction of emotional distress required proof of outrageous conduct. Daley argues that the excluded evidence was relevant to show that respondents' conduct was outrageous, in that their lack of training and required instruments rendered the battery inevitable. As alleged in the complaint, however, Daley's claim for intentional infliction of emotional distress was derivative of her battery claim: if there was no non-consensual procedure, there was no outrageous conduct. Accordingly, if there was no error in excluding the evidence as to the battery claim, any error in excluding it as to the emotional distress claim would be harmless. We therefore focus on the battery claim.

13

patient consents to an electromyogram but physician performs a myelogram, patients consents to exploratory surgery but physician performs mastectomy]; *Kaplan v. Mamelak* (2008) 162 Cal.App.4th 637, 646 [medical battery claim stated where patient consented to surgery on T8-9 disk but defendant performed surgery on T6-7 and T7-8 disks]; *Ashcraft v. King* (1991) 228 Cal.App.3d 604, 610–612 [because patient's consent to blood transfusions was limited by patient to family donors, surgeon's transfusion of blood from nonfamily donors was a battery].) By contrast, where a doctor obtains consent to perform a treatment but does not disclose a potential complication that was a known risk yet "not an integral part of the treatment procedure," the doctor's failure to obtain informed consent sounds in negligence. (*Cobbs*, at pp. 239, 240; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 324; *Daum v. SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285, 1313.) And where a doctor obtains consent to perform a treatment but performs it in a substandard manner, the cause of action sounds in professional negligence. (See *So v. Shin* (2013) 212 Cal.App.4th 652, 667.) Thus, for her battery claim, the key for Daley was to prove that respondents' procedure was substantially different than what Daley consented to and caused the death of her twins.

B. Relevance

Relevant evidence is "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The question for the trial court, therefore, was whether the NIH Evidence tended to prove or disprove what procedure Daley consented to, whether respondents' procedure was substantially different, or what caused the twins' death.

14

As described above, relying on the fact that Daley did not know the contents of the Protocol or other NIH Evidence until years after the surgery, the trial court concluded that the evidence was irrelevant to Daley's consent and therefore irrelevant to whether the procedure performed by respondents was substantially different than the one to which she agreed.

Daley complains that, in so ruling, the trial court erroneously employed a "heightened standard" of relevance to her claims by limiting evidence of consent to what Daley heard, observed, and understood before the surgeries. What Daley describes, however, is not the court's use of an incorrect standard. Rather, the issue is whether the court abused its discretion in applying the correct standard but concluding the evidence was irrelevant.

That said, we question the trial court's ruling in at least one respect—whether Daley made a sufficient showing of relevance for admission of the NIH Protocol. The treatment to which Daley agreed was in the context of a NIH study. The Consent Form repeatedly referred to the NIH's sponsorship and involvement, and the NIH's involvement and oversight gave Daley a sense of security and safety. Moreover, Daley's attorneys made an offer of proof—and Daley subsequently testified—that the Consent Form led her to believe that UCSF (respondents) would "follow protocol."[6] Arguably, the procedure to which Daley consented when signing the NIH Consent Form in Utah was whatever procedure the NIH had reviewed and set up for the surgery in the Protocol (whether she knew the specifics or not), and the mere

---

[6] Indeed, section 8.1 of the Protocol states: "The Principal Investigators of the participating centers have *agreed to abide by the study protocol,* to have comparable staff facilities *and equipment,* and to *ensure the proper conduct* of the study at each center. Proper conduct of the study includes recruitment and treatment of patients as specified in the protocol and accurate data collection." (Italics added.)

15

fact that the surgery was to be performed at UCSF gave Daley no reason to think that respondents would part ways with those Protocol procedures. Because the evidence was reasonably susceptible of that conclusion, the Protocol was not irrelevant to the jury's determination of the procedure to which Daley consented and, ultimately, whether respondents provided a substantially different procedure.  (See Evid. Code, § 403.)

The cases on which respondents rely, and the trial court cited, do not persuade us otherwise.  (*Daum v. SpineCare Medical Group, Inc.*, *supra*, 52 Cal.App.4th at pp. 1311–1313; *Suthers v. Amgen Inc.* (S.D.N.Y. 2005) 372 F.Supp.2d 416, 425; *Suthers v. Amgen Inc.* (S.D.N.Y. 2006) 441 F.Supp.2d 478, 484; *Freedman v. Superior Court* (1989) 214 Cal.App.3d 734, 740, fn. 2.) None of those cases involved the exclusion of evidence of a study protocol where, as here, the patient testified that a consent form led her to believe the surgeons would follow the protocol required by the study.[7]

Ultimately, however, we need not decide whether the trial court's exclusion of the Protocol (and the purported requirements of percutaneous entry and a four-millimeter trocar) constituted an abuse of discretion.  Nor need we decide whether the court erred in excluding the other NIH Evidence, such as evidence that Daley's surgeries were recorded as adverse events, that the second surgery was noted as a protocol deviation, that Dr. Lee believed the loss of Daley's twins was related to respondents' surgeries, that

---

[7] We must also question the trial court's ruling under Evidence Code section 352, which gives the court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission" would lead to the consumption of undue time or create a "substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  If the court did not adequately discern the relevance of the Protocol, it could not have adequately weighed its probative value.

respondents were assigned to additional training and acknowledged that use of laparotomies and larger instruments posed a problem, that the study was paused due to respondents' procedures, and that the death rate of babies and mothers purportedly suggested respondents' procedures caused the demise of Daley's twins. As discussed next, if such error occurred, it was harmless under the circumstances of this case.

C. <u>Harmless Error</u>

Daley cannot obtain reversal of the judgment unless she shows a reasonable probability that she would have obtained a different result if the NIH Evidence had been admitted. (*Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 134; Evid. Code, § 354; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) She fails to do so.

Daley broadly urges that the trial court's error "made it impossible for . . . Daley to prove her claims." (Boldface omitted.) To the contrary, Daley presented the essential theory of her case through her own testimony and through her expert witness, Dr. Quintero. Dr. Quintero opined at length that respondents' procedure was "entirely different" than the procedure he instituted for SFLP and what the Consent Form required. He pointed out that the surgery calls for percutaneous entry and the Consent Form described an incision of just four-millimeters, but respondents instead "opened the abdomen." He noted that the Consent Form says a four-millimeter instrument would be used, but respondents used a device that expanded to five millimeters. He provided multiple reasons that respondents' procedure was more invasive than the procedure for SFLP contemplated by the NIH study and opined it caused the fetal deaths.

Daley counters, however, that Dr. Quintero "was unable to show with reference to the Protocol itself, that the surgery the UCSF Researchers were

17

required to perform, was percutaneous." In other words, it was one thing for Dr. Quintero to testify that the *Consent Form* required a certain procedure, which respondents could rebut; it would have been different if Dr. Quintero could have pointed to the *Protocol* to establish that percutaneous surgery was, in fact, required. As such, Daley urges that respondents' witnesses escaped vital cross-examination and Dr. Quintero "had to endure defense cross-examination with one arm tied behind his back."

We appreciate the distinction Daley draws (and respondents ignore). Nevertheless, we conclude that the excluded NIH Evidence would have made little difference in light of the other evidence at trial.

First, although Daley testified that she thought a "protocol" would be followed, the jury was not required to believe her. If Daley was not found credible on this point, any link between the Protocol and the scope of her consent would vanish, and the terms of the Protocol would have made no difference in the outcome.

Second, even if the jury did believe that Daley thought a protocol would be followed, and that she consented only to the procedure the Protocol described, there is still no reasonable probability that the admission of the Protocol would have tipped the scales in Daley's favor. Fundamentally, the Protocol and the Consent Form were essentially the same with respect to the key issues of the size of the incision and trocar and the use of a laparotomy. Both documents referred to a four-millimeter incision to be made into the skin for insertion of a four-millimeter trocar. As to laparotomies, the Consent Form stated that, "In rare instances in which we are unable to see the surface of the placenta, a laparotomy (opening of the abdomen) to expose the uterus may be necessary," usually because "the placenta is on the front surface of the uterus." Conveying the same idea, the Protocol stated that less

18

than 10 percent of the time, "some cases with anterior placentas may require a second port or even a laparotomy to expose the surface of the uterus." Because the Consent Form was nearly identical to the Protocol on these points, there is no reason to believe that Daley would have fared better if the Protocol had been admitted into evidence.

It is true that the Protocol affirmatively stated that "almost all procedures can be performed . . . percutaneous[ly]" and the Consent Form did not. The question in this case, however, was not whether the doctors were to perform the SFLP procedure percutaneously in most instances, but the more specific question of whether the laparotomy (and hysterotomy) performed on Daley was substantially different than the procedure to which she consented, where her consent recognized the possibility of a laparotomy in some circumstances. As to those circumstances—and thus the breadth and conditions of her consent—the Consent Form and Protocol were virtually identical, and there is no reasonable probability that the presence or absence of the word "percutaneous" affected the jury's verdict here.

Furthermore, to the extent Daley believes it would have been helpful to establish that the procedure was typically percutaneous, the admission of the Protocol would not have been as compelling as she suggests. For example, assuming Daley had been allowed to introduce the Protocol to try to show that a percutaneous (puncture) approach was necessary, the cited portion of the Protocol does not literally state that percutaneous entry was *required*, but that "almost all procedures *can* be performed by a single percutaneous port." (Italics added.) Again, the Protocol expressly stated that "some cases with anterior placentas may require a second port or even a *laparotomy* to expose the surface of the uterus." (Italics added.) Thus, the Protocol contemplated the possibility of a laparotomy like the one performed by respondents. That

19

Daley did not have an anterior placenta does not change the fact that Daley, by agreeing to the Protocol, necessarily consented to the possibility of a laparotomy.

Further still, even if the Protocol were construed to require percutaneous entry, Daley agreed in the Consent Form to a "4-mm (*about 4 inches*) *incision*." (Italics added.) Thus, she understood that a "cut" would be made in her abdomen. Dr. Farmer testified that she told Daley that she would make an *incision*, expose the uterus so they could insert the trocar, and insert the fetoscope so they could see the blood vessels. Daley did not deny having this conversation and generally recalled that respondents were going to "go in" and cauterize the blood vessels. In fact, the jury heard Daley's deposition testimony that she knew the surgeons would decide the size of the opening in her uterus based on what they considered her best interests. Similarly, even if Daley had been allowed to introduce the Protocol to show that respondents were required to use a four-millimeter trocar, the evidence established that a five-millimeter expanding trocar was not substantially different: at the insertion point, the five-millimeter trocar actually has a diameter of just three millimeters. In short, even with the Protocol in evidence, there is no reasonable probability the jury would have found that Daley received a *substantially* different treatment than the one to which she consented.

Nor would the NIH Evidence have destroyed respondents' credibility. Daley argues that Dr. Farmer "offered testimony dancing around the size of the trocar that was supposed to be used, which . . . Daley was unable to show was not credible by bringing to bear the excluded NIH Study evidence." But the testimony Daley cites is this: "Q: It says *here* the size is referenced as 4 millimeters, right? [¶] A: I'm not sure, 4 millimeters—what of the piece of

the instrument the 4 millimeters refers to here. *But, yes, that is correct.* [¶] Q: And we agree that you used an instrument that was 5 millimeters, correct? [¶] A: That the final size of the expanding device was 5 millimeters, *yes*." (Italics added.) There was no dancing. Farmer agreed with counsel as to what the Consent Form said and what instrument she used.

Daley argues that respondents "used the exclusion of the NIH Study materials to bolster their own pedigree/prestige in front of the jury by pointing to their experience, when . . . Daley was left unable to push-back that [respondents], in fact, lacked the training necessary to perform the NIH Study procedure, and were required to go to Germany to receive training." Daley similarly argues that she "could have easily shown, with the excluded NIH Study evidence, that [respondents] lacked the training to perform the NIH Study surgery they agreed to provide, and . . . Daley agreed to receive, under the Study protocol." The documents to which Daley refers are minutes of a meeting regarding the NIH trial, in which additional training was recommended for two surgeons from each NIH trial site, and other documents confirming completion of the training by Dr. Lee and Dr. Ball. However, the material indicates that researchers from across the entire NIH trial were to observe procedures in Germany, not that respondents were called out for lacking the training needed to perform SFLP. Moreover, even a mandate for additional training would not mean that the treatment Daley received was substantially different than the treatment to which she consented. (See also Evid. Code, § 1151 [evidence of subsequent remedial measures "inadmissible to provide negligence or culpable conduct in connection with the event"].)

21

Daley further argues that respondents "utilized the exclusion of the NIH Study documents, which make abundantly clear that the second surgery that was performed on . . . Daley was a part of the Study, to make it seem as though it was not governed by the Study." But Daley did not need the NIH Evidence to show that the second procedure was governed by the NIH study, because the parties stipulated—and the jury was instructed— that it had to accept as true that "the parties agree that . . . Daley was part of the NIH study during her procedures at UCSF." The exclusion of the evidence cannot be prejudicial for the reason articulated in Daley's argument.

Daley next contends the evidence would have shown "that the use of the larger instrument at UCSF was not only improper, but acknowledged as problematic." The documents Daley cites—the study steering meeting minutes of August 16, 2004—state that "the diameter of the endoscope used in San Francisco was larger than that used in Philadelphia" and "Drs. Harrison, Farmer and Ball recognized this as a problem and have corrected their approach to perform the laser therapy by using the percutaneous technique." The doctors' acknowledgement of a problem does not show what Daley consented to or whether respondents' procedure was substantially different. To the contrary, the document states that the National Institute of Child Health and Human Development decided the data gathered at UCSF "should be analyzed and *not* excluded," perhaps suggesting that the procedures at UCSF were *not* substantially different than the procedures required by the Protocol. And to the extent the evidence was relevant to

22

causation, any error in its exclusion was harmless, because the jury rejected Daley's claims on other grounds.[8]

Lastly, Daley contends the NIH Evidence would have shown that the surgeries were recorded as adverse events and a protocol deviation. The essence of the cited documents is that the first surgery could not be completed because bleeding impaired visibility and a second procedure thus became necessary. The evidence was cumulative to the testimony of Daley's expert and did little if anything to show that respondents' procedure was substantially different than what Daley agreed to.

In the end, Daley consented to "selective" "fetoscopic" "laser photocoagulation," and it is undisputed that she received a treatment that was "selective," was "fetoscopic," and involved "laser photocoagulation." She agreed in the Consent Form to a "4-mm (*about 4 inches*) incision" to allow entry of a four-millimeter fetoscope through the abdominal wall and into the amniotic sac, as well as the use of a laser to seal blood vessels on her placenta, and there is no evidence she received something substantially different. (Italics added.) Although the Protocol called for a four-millimeter trocar, respondents' five-millimeter expanding trocar was even smaller than that at the insertion point. Although the Protocol arguably called for percutaneous entry, Daley knew that the surgery would involve a cut in her abdomen and a hole in her uterus, and she understood that the surgeons would decide how big the openings should be. Daley was further advised of the possibility of a laparotomy. Although (consistent with the Protocol) the

---

[8] Statements by Dr. Lee purportedly linking respondents' procedures to the death of the twins, if competent testimony, may have been relevant to causation. But the jury did not reach the special verdict questions on causation, rejecting Daley's claim on other grounds. Any erroneous exclusion of causation evidence was therefore harmless.

Consent Form stated that laparotomy would be reserved for "rare instances" in which the surgeons cannot see the placenta surface, there was evidence that she knew her abdomen and uterus would be opened, and thus knew a laparotomy (opening of the abdomen) and hysterotomy (opening of the uterus) could occur. While Daley may have received a procedure that was on some points different than what was described in the Protocol, and perhaps not up to the standards of the Protocol, the excluded NIH Evidence did not show that Daley received a *substantially* different treatment as required for medical battery. Given the totality of the evidence, we find no reasonable probability that Daley would have obtained a more favorable result if the NIH Evidence had been admitted.

## III. DISPOSITION

The judgment is affirmed.

24

Chou, J.

WE CONCUR:


Jackson, P. J.


Burns, J.


A165440
*Daley v. Regents of the University of California*

25